# STATE OF MONTANA,
## Plaintiff/Respondent,
### v.
# PERRY JAMES PEPLOW,
## Defendant/Appellant.

No. 99-648.
Submitted on Briefs May 10, 2001.
Decided December 10, 2001.
2001 MT 253.
307 Mont. 172.
36 P.3d 922.

For Appellant: **David E. Stenerson**, Stenerson Law Office, Hamilton.

For Respondent: **Hon. Mike McGrath**, Montana Attorney General, **C. Mark Fowler**, Assistant Montana Attorney General, Helena; **George H. Corn**, Ravalli County Attorney, Hamilton.

JUSTICE COTTER delivered the Opinion of the Court.

¶1 On May 25, 1999, a jury convicted Perry Peplow (Peplow) of five criminal offenses: driving under the influence of alcohol; driving with a suspended or revoked license; operating a motor vehicle without

liability insurance; failing to report an accident involving property damage; and tampering with or fabricating physical evidence. Prior to the jury trial, Peplow sought to tender pleas of guilty on two of the five counts. The District Court ruled it was not required to accept them and proceeded to trial on all five counts. At the close of the State's case, Peplow made a motion for a directed verdict on the tampering with evidence count, which the District Court denied. Peplow appeals these two District Court rulings. We reverse.

¶2 We address the following issues:

1. Whether consuming alcohol after a vehicle accident constitutes the crime of tampering with physical evidence under § 45-7-207, MCA;

2. Whether the District Court erred when it refused to accept Peplow's guilty pleas on two of the five counts against him; and

3. If the answer to Issue 2 is yes, did the error prejudice Peplow?

## FACTUAL BACKGROUND

¶3 On November 18, 1998, at around 5:30 p.m., Peplow went to the Rustic Hut bar in Florence, Montana. Witnesses were unsure what Peplow had to drink at the Rustic Hut. While at the bar, Peplow and two friends decided to have dinner. There was conflicting testimony as to what Peplow drank at dinner; one witness testified Peplow drank milk, while another indicated he had an alcoholic beverage. After dinner, Peplow drove to a friend's house on Upper Woodchuck Road. Peplow had at least one drink at his friend's house and around 8:30 p.m., proceeded to drive toward his home located behind the Rustic Hut.

¶4 As Peplow was driving home and approaching a curve in the road, his truck went off the road into a field. His truck hit several fences and an irrigation vent, causing over $600.00 worth of damage. According to Peplow, he went off the road when he reached for a cigarette lighter that he had dropped on the floorboard. Peplow testified he injured his neck and head in the accident.

¶5 Following the accident, Peplow left his truck and began walking toward Florence. Around 9:00 p.m., Pastor Michael Metzger (Michael) and his wife, Deborah saw Peplow who, according to Michael, was having difficulty walking. Michael passed Peplow, but once he saw the truck off the side of the road, with its radiator steaming, he backed his vehicle up to where Peplow was walking in order to check on his condition. Upon reaching Peplow, Michael rolled down his window and asked Peplow if he was alright. Michael observed Peplow stagger and then reach towards Michael's arm in an effort to balance himself. Peplow missed Michael's arm and then grabbed for it again. Peplow answered that he was fine, and Michael observed Peplow's speech was

slurred, but that he did not appear to be injured. Deborah testified Peplow's speech was very slow, very deliberate and calculated. Both Michael and Deborah testified they thought Peplow was intoxicated. At 9:11 p.m., Michael called 911, to report the accident. He described the vehicle, its license plate and his encounter with Peplow.

¶6 As Peplow continued walking to his residence, he was picked up and given a ride to his home. According to Peplow, he was hurting from the accident so he drank three double shots of whiskey and then walked his dog. At approximately 9:30 p.m., Peplow went to the Rustic Hut. Peplow told the bartender, Deborah Ross (Ross), that he wrecked his truck and had left it up on the hill, and then he ordered a beer. Ross testified that Peplow did not look injured in any way.

¶7 Montana Highway Patrol Officer Tom Hamilton (Hamilton) was dispatched to the accident scene. According to Hamilton, there were no brake marks at the accident scene, and in his opinion, the curve was obvious and not difficult to maneuver. Hamilton photographed the truck and surrounding area and examined the truck. Hamilton testified the truck cab smelled of beer and contained empty beer cans and bottles. Once Hamilton learned Peplow was the owner of the truck, he ran a check on Peplow's driver's status, which came back as revoked. Hamilton also noted there was no proof of insurance in the truck. Hamilton then tried to locate Peplow.

¶8 The dispatcher had information indicating Peplow lived behind the Rustic Hut, so Hamilton asked dispatch to call the bar and ask where Peplow lived. The dispatcher called the bar and talked to the bartender, Ross, who told the dispatcher Peplow was at the bar. After the call, Ross told Peplow that a law enforcement officer was coming to talk to him and she took away his half-empty beer. The dispatcher informed Hamilton that Peplow was at the Rustic Hut. Hamilton testified it takes approximately eight minutes to drive from the accident scene to the Rustic Hut, a distance of 4.8 miles.

¶9 Hamilton arrived at the Rustic Hut at approximately 9:50 p.m., and asked Peplow to step outside. Hamilton testified that Peplow's eyes were bloodshot, his speech was slurred, he had alcohol on his breath, and he staggered when he walked. Hamilton concluded Peplow was intoxicated. Hamilton performed the horizontal gaze nystagmus (HGN) test on Peplow, which according to Hamilton, indicated a high level of impairment. Peplow refused to perform any other field sobriety exercises. When Hamilton asked Peplow to take a preliminary breath test (PBT), Peplow agreed, stating that he would "blow drunk." The result of the PBT indicated Peplow's blood alcohol level (BAC) was .202.

¶10 Following the PBT test, Hamilton told Peplow that the bartender

indicated Peplow had only half a beer, and Peplow then told the officer he drank three shots at home after the accident. During Hamilton's conversations with Peplow, Peplow admitted he did not have insurance. Peplow did not complain of any injuries, nor did Hamilton observe any injuries on him. However, upon arriving at the jail, Peplow complained of a sciatic nerve problem. At the jail, Hamilton read Peplow the implied consent form, and Peplow agreed to take a breathalyser test. The result of the breathalyser test indicated Peplow's BAC was .202.

¶11 An Information was filed on December 2, 1998, charging Peplow with the following offenses: driving under the influence, fourth offense; driving while license is suspended or revoked, third offense; operating a motor vehicle without liability insurance, third offense; failure to report an accident involving property damage; and tampering with or fabricating physical evidence, based on his consumption of alcoholic beverages after the accident.

¶12 A jury trial was set for May 24, 1999. Prior to trial, Peplow asked the court to allow him to tender guilty pleas on two of the five charges: driving with a revoked license and driving without insurance. The State objected, and argued the two charges were part of the *res gestae,* and were relevant in showing that Peplow's judgment was impaired. Peplow contended it would be highly prejudicial for the jury in a DUI trial to hear evidence that his license was already revoked and that prejudice to him outweighed the probative value to the State. He maintained the State had other witness testimony and evidence indicative of impairment. Peplow also argued that the two charges were not part of the *res gestae*, asserting that one can be ticketed for driving without insurance or without a license when not driving drunk, and vice versa.

¶13 The District Court concluded the two offenses were highly probative on the issue of impairment, and asked the parties if they were aware of any case law on this issue. Both the State and Peplow responded they knew of none. The court ruled in favor of the State, noting the two offenses were part of the *res gestae*, and proceeded to trial.

¶14 After the State rested, Peplow made a motion for a directed verdict concerning the charge of tampering with and fabricating physical evidence, and the District Court heard oral argument from both parties. Peplow argued that a person's BAC level does not fit the definition of a "record, document, or thing," as one of the required elements under § 45-7-207, MCA. Peplow also contended the State failed to present evidence that Peplow knew or had reason to believe that an official proceeding or an investigation was pending or about to

be instituted. The State asserted that given the facts, it was reasonable for the jury to infer Peplow believed there would be an investigation. Finally, the State asserted that consuming alcohol does change or alter a "thing," that being a person's blood.

¶15 The trial court concluded that whether Peplow believed or should have believed there would be an investigation was a factual question for the jury. The court further concluded that the word "thing," as used in § 45-7-207, MCA, was broad enough to include one's blood alcohol level.

¶16 The jury returned verdicts of guilty on all counts, and Peplow was sentenced on June 21, 1999. Peplow now appeals the District Court's refusal to accept his guilty pleas on the driving while revoked and driving without insurance charges, and the District Court's denial of his motion for a directed verdict on the charge of tampering with physical evidence.

## STANDARD OF REVIEW

¶17 When this Court reviews a district court's conclusions of law regarding the application of a statute, our standard of review is "whether the tribunal's interpretation of the law is correct." *State v. Henning* (1993), 258 Mont. 488, 490-91, 853 P.2d 1223, 1225 (citation omitted); *See also State v. Miller* (1996), 278 Mont. 231, 233, 924 P.2d 690, 691. We review the District Court's interpretation of the statutes at issue as one of law, and in this respect, our review is plenary. *State v. Weis* (1997), 285 Mont. 41, 43, 945 P.2d 900, 902 (citation omitted).

## DISCUSSION
### Issue 1
¶18 **Does consuming alcohol after a vehicle accident constitute tampering with physical evidence under § 45-7-207, MCA?**

¶19 In the Information the State alleged that Peplow, believing an official proceeding or investigation was about to begin, altered or concealed evidence of his BAC by consuming alcoholic beverages after the accident. At the close of the State's case, Peplow moved for a directed verdict on the tampering with evidence count, alleging the State failed to prove Peplow believed an official proceeding or investigation was pending. Peplow also argued that a person's BAC level does not fit the definition of a "record, document, or thing," as required under § 45-7-207, MCA. In denying his motion, the District Court concluded that drinking after the accident "would alter a thing; the thing being his blood-alcohol level." In interpreting the meaning of the statute, the court explained, "I can't imagine a more broad term

than 'thing.' That's not defined in the code. So I think we have to apply its ordinary meaning and that would cover just about anything."

¶20 ■ In construing a statute, "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted," and if several statutory provisions apply, effect should be given to them all if possible. Section 1-2-101, MCA. The rules of statutory construction require the language of a statute to be construed according to the plain meaning of the words used. *Sherner v. Conoco, Inc.*, 2000 MT 50, ¶ 35, 298 Mont. 401, ¶ 35, 995 P.2d 990, ¶ 35 *(amended by Order denying rehearing, Mar. 30, 2000)* (citation omitted). If the intent of the Legislature can be determined from the plain meaning of the words used, the court may not go further and apply other means of construction. *Spoonheim v. Norwest Bank Montana, N.A.* (1996), 277 Mont. 417, 420, 922 P.2d 528, 530 (citation omitted). Finally, construction of a statute should not lead to absurd results if reasonable construction will avoid such results. *Montco v. Simonich* (1997), 285 Mont. 280, 287, 947 P.2d 1047, 1051 (citation omitted).

¶21 The tampering with evidence statute under which Peplow was charged provides in relevant part:

(1) A person commits the offense of tampering with or fabricating physical evidence if, believing that an official proceeding or investigation is pending or about to be instituted, he:

(a) alters, destroys, conceals, or removes any record, document, or thing with purpose to impair its verity or availability in such proceeding or investigation;

Section 45-7-207, MCA. While the term "physical evidence" as used in the foregoing statute is not defined, the term "evidence" is defined elsewhere. "Evidence" is defined as "the means of ascertaining in a judicial proceeding the truth respecting a question of fact, including but not limited to witness testimony, writings, physical objects, or other things presented to the senses." Section 26-1-101(2), MCA.

¶22 ■ Reading these statutes together, we must determine whether a person's blood alcohol content, as it exists inside their body and within their control, constitutes "physical evidence," or a "thing presented to the senses." We conclude it does not.

¶23 When a defendant is on trial for driving under the influence, "evidence of any measured amount or detected presence of alcohol, drugs, or a combination of alcohol and drugs in the person at the time of the acts alleged, *as shown by an analysis of the person's blood or*

*breath*, is admissible." Section 61-8-404(1)(a), MCA (1997) (emphasis added). Montana's implied consent law provides that:

(1) A person who operates or is in actual physical control of a vehicle upon ways of this state open to the public is considered to have given consent to a *test or tests* of the person's blood or breath for the purpose of determining any *measured amount* or *detected presence* of alcohol or drugs in the person's body.

Section 61-8-402(1), MCA (1997) (emphasis added).

¶24 A blood sample is real, physical evidence of a nontestimonial nature beyond Fifth Amendment protection. *State v. Jackson* (1983), 206 Mont. 338, 343, 672 P.2d 255, 257 (distinguishing *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. We have held that the police may seize any evidence which is likely to disappear before a warrant can be obtained, such as a *blood sample* containing alcohol. *State v. Ellinger* (1986), 223 Mont. 349, 355, 725 P.2d 1201, 1205 (citing *State v. Deshner* (1971), 158 Mont. 188, 193, 489 P.2d 1290, 1293; and *Schmerber*, 384 U.S. at 770-71, 86 S.Ct. 1826) (emphasis added).

¶25 Whether we are considering the 1997 or current version of the Montana Code, clearly, under § 61-8-404, MCA, evidence of alcohol or drugs in a person must be "shown by an analysis of the person's blood or breath" for it to be admissible. Stated otherwise, one's BAC is not evidence until it exists in a state capable of analysis. While one's blood is in his body, it is in a constant state of biochemical flux. This Court has repeatedly recognized the evanescent nature of alcohol levels in a person's blood stream. *See State v. Dolan* (1997), 283 Mont. 245, 252, 940 P.2d 436, 440; and *Ellinger*, 223 Mont. at 355, 725 P.2d at 1205 (citing *Deshner*, 158 Mont. at 193, 489 P.2d at 1293 and *Schmerber*, 384 U.S. at 770-71, 86 S.Ct. 1826).

¶26 Section 61-8-404, MCA, clearly does not contemplate that *potentially* measurable amounts of alcohol, still within the human body, constitute evidence. Until one's breath or blood has been obtained or collected for analysis, it simply cannot be considered "physical evidence," as set forth in § 45-7-207, MCA, or a "thing presented to the senses," as explained in § 26-1-101(2), MCA. Because a person's blood alcohol level cannot be determined until he or she expels either a sample of blood, air, or urine, such fluids simply cannot be considered physical evidence prior to being removed from the body. We therefore conclude that physical evidence of one's alcohol content is limited to that which is collected for analysis of the person's blood or breath, under § 61-8-404, MCA. One's blood, and blood alcohol level, while still within his body, simply is not physical evidence.

Accordingly, a person who consumes alcohol after a motor vehicle accident cannot be convicted of the offense of tampering with "physical evidence," as contemplated under § 45-7-207, MCA, with respect to the person's blood, breath, or urine still within his body.

¶27 This conclusion avoids absurd results. Construction of a statute should not lead to absurd results if reasonable construction will avoid such results. *Montco*, 285 Mont. at 287, 947 P.2d at 1051. If we were to conclude today that consuming alcohol after an accident constitutes tampering with evidence, then conceivably, any driver who eats, sleeps, or even receives medical treatment (i.e., intravenous fluids) after an accident could also be accused of tampering with their blood alcohol level.

¶28 ■ Accordingly, we conclude the District Court erred when it held that Peplow's BAC level, while still within his body, constituted physical evidence subject to illegal tampering. We therefore reverse Peplow's conviction for tampering with the evidence.

## Issue 2

¶29 **Did the District Court err when it refused to accept Peplow's guilty pleas on two of the five counts against him?**

¶30 The State first argues Peplow waived his right to appeal the District Court's refusal to accept his two guilty pleas because Peplow's objections were general and he failed to present any authorities on the issue. Peplow responds that there was a thorough discussion between the District Court and the parties concerning the issue, noting the court even researched the issue on its own. Peplow contends there was no authority to cite in support of his argument, as the issue is one of first impression in Montana.

¶31 The State relies on Rule 103, M.R.Evid., and case law applying that rule, for the proposition that Peplow's objection must be specific. However, the issue before the trial court was not an evidentiary question. The court was simply asked to accept Peplow's pleas of guilty to two counts. It is obvious from the record that the District Court understood the nature of Peplow's argument. Moreover, immediately following the ruling, Peplow explicitly objected to not being able to present guilty pleas. We conclude Peplow properly preserved his objection for appeal.

¶32 In ruling that Peplow was not entitled to plead guilty to the charges of driving while suspended or revoked and driving without insurance, the District Court concluded Peplow's actions giving rise to the counts were part of the *res gestae* and probative of the issue of

impairment.[1] The court cited three cases it felt were relevant to the issue: *Numan v. Arkansas* (1987), 722 S.W.2d 276 (defendant not allowed to plead guilty because there is no Federal Constitutional right to plead guilty, and although a state may confer such a right, Arkansas had no such rule or statute); *United States v. Severino* (1986), 800 F.2d 42 (2nd Cir.) (*cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987)) (trial judge is not required to accept every constitutionally valid plea, thus the court did not abuse discretion by refusing to accept a guilty plea when defendant was not testifying truthfully); and *Ohio v. Johnson* (1984), 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (*reh'g denied,* 468 U.S. 1224, 105 S.Ct. 20, 82 L.Ed.2d 915 (1984)) (acceptance of a guilty plea on multiple lesser included offenses, while the charges of the greater offense remain pending, did not constitute an implied acquittal and defendant was not entitled to use double jeopardy to prevent prosecution). The District Court also noted it had reviewed Montana statutes and concluded there was nothing that required acceptance of a guilty plea even if properly made. Because the District Court's ruling was an interpretation of law, we review its decision to determine if it was correct. *Miller,* 278 Mont. at 233, 924 P.2d at 691.

¶33 A criminal defendant's right to plead guilty over the State's objection is an issue of first impression in Montana. The principles governing the entry and withdrawal of guilty pleas are set forth in both statute and case law. *State v. Enoch* (1994), 269 Mont. 8, 11, 887 P.2d 175, 177 (citing *State v. Radi* (1991), 250 Mont. 155, 818 P.2d 1203). Trial courts must meet statutory requirements such as those contained in §§ 46-12-201, through -213 and 46-16-105, MCA, before accepting a guilty plea. Chapter 12 of Title 46 of the Montana Code deals with arraignment procedures, while Chapter 16 of Title 46 concerns procedure at trials.

¶34 Peplow's alleged offenses took place in November of 1998, and thus the 1997 Montana Code provisions apply. Section 46-12-204, MCA (1997), sets forth the plea alternatives for criminal defendants:

> (1) A defendant may plead guilty or not guilty. If a defendant refuses to plead or if a defendant corporation fails to appear, the court shall enter a plea of not guilty.
>
> (2) The court may not accept a plea of guilty without first

---

[1] In *State v. Hansen,* 1999 MT 253, 296 Mont. 282, 989 P.2d 338, we abandoned the doctrine of *res gestae. Hansen,* ¶¶ 72-84. We stated that we will, "instead, use the specific rule of evidence or statute that applies to the factual situation presented" to determine the admissibility of the evidence. *Hansen,* ¶ 81. While the trial court incorrectly applied the *res gestae* doctrine in the case at bar (*Hansen* had not been handed down at the time the District Court made its ruling), that error is irrelevant given our resolution of this issue on the basis of statutes hereinafter discussed.

determining that the plea is voluntary and not the result of force or threats or of promises apart from the plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty results from prior discussions between the prosecutor and the defendant or the defendant's attorney.

(3) With the approval of the court and the consent of the prosecutor, a defendant may enter a plea of guilty, reserving the right, on appeal from the judgment, to review the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, the defendant must be allowed to withdraw the plea.

A court may not accept a guilty plea without first determining that there is a factual basis for the plea. Section 46-12-212(1), MCA.

¶35 We have stated that prior to accepting a guilty plea, the trial court must satisfy the requirements of §§ 46-12-210 and 46-16-105, MCA. *State v. Melone*, 2000 MT 118, ¶ 16, 299 Mont. 442, ¶ 16, 2 P.3d 233, ¶ 16 (citing *State v. Roach*, 1999 MT 38, ¶ 9, 293 Mont. 311, ¶ 9, 975 P.2d 817, ¶ 9).

¶36 ▮ Before accepting a plea of guilty, the trial court "shall determine that the defendant understands" the nature of the charges, the mandatory minimum and the possible maximum penalties, any restitution obligations, if applicable, and the defendant's right to an attorney, if not represented by one. Section 46-12-210(1)(a) and (b), MCA (1997). In addition, the court must ensure the defendant understands he or she has the right to: plead not guilty; be tried by a jury; confront and cross-examine witnesses; and not be compelled to testify against himself or herself. Section 46-12-210(1)(c), MCA (1997). The court must advise the defendant that it is not required to accept the terms of any plea agreement reached between the defendant and the prosecutor, and that the defendant may not withdraw a guilty plea if the agreement is not accepted pursuant to § 46-12-211, MCA. Section 46-12-210(1)(d), MCA (1997).

¶37 Section 46-16-105, MCA (1997), provides for a plea once a case proceeds to trial:

(1) Before or during trial, a plea of guilty may be accepted when:

(a) subject to the provisions of subsection (3), the defendant enters a plea of guilty in open court; and

(b) the court has informed the defendant of the consequences of the plea and of the maximum penalty provided by law that may be imposed upon acceptance of the plea.

(2) At any time before or after judgment, the court may, for

good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted.

(3) For the purposes of this section, in cases in which the defendant is charged with a misdemeanor offense, an entry of a plea of guilty through the use of two-way electronic audio-video communication [may be] considered to be an entry of a plea of guilty in open court. Audio-video communication may be used if neither party objects and the court agrees to its use. ...

¶38 "Because a defendant waives numerous constitutional rights when pleading guilty, 'it is a well-settled legal principle that a guilty plea must be a voluntary, knowing, and intelligent choice among the alternative courses of action open to the defendant.'" *State v. Sanders*, 1999 MT 136, ¶ 14, 294 Mont. 539, ¶ 14, 982 P.2d 1015, ¶ 14 (citation omitted); *See also State v. Keys*, 1999 MT 10, ¶ 12, 293 Mont. 81, ¶ 12, 973 P.2d 812, ¶ 12; and *North Carolina v. Alford* (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162.

¶39 A defendant does not have an absolute right under the United States Constitution to have a guilty plea accepted. *Lynch v. Overholser* (1962), 369 U.S. 705, 719, 82 S.Ct. 1063, 1072, 8 L.Ed.2d 211, 220; *Alford*, 400 U.S. at 38 n.11, 91 S.Ct. 160 n.11. However, a state may confer such a right by statute or rule. *Alford*, 400 U.S. at 38 n.11, 91 S.Ct. 160 n.11.

¶40 The District Court, in refusing to accept Peplow's guilty pleas, found there was no statutory authority requiring the court to accept a guilty plea tendered by a defendant. We disagree.

¶41 ■ A general principle of statutory construction provides that when the word "may" is used to confer power upon an "officer, court, or tribunal, and the public or a third person has an interest in the exercise of power, then the exercise of the power becomes imperative." *Lamb v. Missoula Imports, Inc.* (1988), 230 Mont. 183, 188, 748 P.2d 965, 968 (citation omitted).

¶42 Under § 46-16-105, MCA (1997), "[b]efore or during trial, a plea of guilty *may* be accepted" if the defendant enters the plea in open court and the court has informed the defendant of the consequences of the plea and the potential maximum penalties that may be imposed (emphasis added). Thus, prior to or during trial, a court is mandated to accept a defendant's guilty plea, as long as the statutory requirements of voluntariness, intelligence, and factual basis for the plea, are fulfilled. Likewise, the Montana Code also confers a right to plead guilty at arraignments under § 46-12-204(1), MCA (1997) ("A defendant may plead guilty or not guilty."). There is no limitation imposed upon a defendant's right to plead. Presumably, had the

Legislature intended to require the consent of the court or State as a condition to a plea of guilty, it would have so stated. In fact, the Legislature imposed a consent of the court condition to a plea of nolo contendere in the 1999 Amendments to § 46-12-204(1), MCA ("A defendant may plead guilty, not guilty, or, with the consent of the court and the prosecutor, nolo contendere."). Notably, no such limitation upon a plea of guilty appears in either version of the statute.

¶43 ■ We conclude that Montana statutes confer upon a defendant the right to plead guilty to the crime charged either at the arraignment, pursuant to § 46-12-204, et. al, MCA, or before or during trial, pursuant to § 46-16-105, MCA. Thus the District Court erred in denying Peplow that right prior to trial.

## Issue 3

¶44 **Did the District Court's error in denying Peplow the right to plead guilty, prejudice Peplow?**

¶45 ■ Not all error committed by a district court in a criminal proceeding is reversible error:

> A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial.

Section 46-20-701(1), MCA. Our recent decision in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, established a two-step analysis for determining whether an error prejudiced the criminal defendant's right to a fair trial. The first step is determining whether the error is a structural error or trial error. *Van Kirk*, ¶ 37. Structural error is typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire proceeding. *Van Kirk*, ¶ 38. Structural errors are automatically reversible. *Van Kirk*, ¶ 39. Trial errors are those errors that typically occur during the presentation of a case to the jury and may be qualitatively assessed by reviewing the record for any prejudicial impact in relation to other evidence presented at trial. *Van Kirk*, ¶ 40. Trial errors are not presumptively prejudicial and are subject to review under our harmless error statute, § 46-20-701(1), MCA. *Van Kirk*, ¶ 40.

¶46 ■ Although the District Court's error in denying Peplow the right to plead guilty preceded the trial, the error did not undermine the fairness of the entire trial proceeding nor was it of constitutional dimensions (a criminal defendant's right to plead guilty is a right conferred by statute; *See* ¶ 43 herein). We conclude the error was not a structural error, but rather a trial error. We therefore proceed to the second step of the analysis and determine whether the error was

harmless.

¶47 Once a convicted person raises and establishes that the evidence in question was erroneously admitted and has alleged prejudice, the State must then demonstrate the error was not prejudicial (i.e., harmless). *Van Kirk*, ¶ 42. We adopted the "cumulative evidence" test to determine whether an error was harmless, meaning the State must demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44.

¶48 Peplow contended it would be highly prejudicial in a DUI trial for the jury to hear his license was already suspended, arguing that "[i]t gives a clear indication that his [Peplow's] driving was in question at least once before, that he probably had a DUI, or for some reason his license had been suspended and his insurance had been revoked." Peplow's contentions of prejudice have arguable merit. Thus it is now incumbent upon the State to demonstrate that, qualitatively, no reasonable possibility exists that the inadmissible evidence might have contributed to Peplow's conviction.

¶49 In *Van Kirk* we distinguished tainted evidence admitted to prove an element of a crime from tainted evidence that does not. When the inadmissible evidence is introduced to prove an element of the crime, the State must direct us to admissible evidence that proves the same facts as the tainted evidence, and must also demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44. However, if the tainted evidence does not go to the proof of an element of the crime, the admission of the evidence will be deemed harmless only if the State demonstrates that no reasonable possibility exists that the admission of the tainted evidence might have contributed to the defendant's conviction. *Van Kirk*, ¶ 46. Therefore, we must determine if the evidence proving Peplow drove while his license was suspended and drove without insurance went to prove an element of either of the substantive charges of DUI or failing to report an accident.

¶50 The State argued, and the District Court agreed, that the two charges, driving while suspended or revoked and driving without insurance, were relevant in proving the "under the influence" element of the DUI offense. We disagree.

¶51 A defendant's acts of driving with a suspended or revoked license and driving without insurance are "unrelated to his [a defendant's] criminal objective of DUI–ingesting alcohol and driving a vehicle while under the influence of alcohol." *State v. Couture*, 1998 MT 137, ¶ 12,

289 Mont. 215, ¶ 12, 959 P.2d 948, ¶ 12 (driving with suspended or revoked license and driving without insurance are not part of the "same transaction" of a DUI, and therefore pleading guilty to the two former charges did not trigger double jeopardy protection when later prosecuted for the DUI). Likewise, evidence of those two charges are not probative to Peplow's charge of failing to report. We conclude evidence concerning Peplow's acts of driving while suspended and driving without insurance did not go to prove an element of either remaining offense. We now must determine if the quality of the inadmissible evidence was such that there was no reasonable possibility that it might have contributed to Peplow's conviction.

¶52 During the trial, Hamilton testified that he looked in Peplow's truck for proof of insurance, and found none. Peplow admitted to Hamilton and the jury that he did not have any insurance at the time of the accident. Hamilton testified that when he checked Peplow's driver's record, he found Peplow's license was revoked. During this testimony, the State introduced a copy of Peplow's driving record that indicated his driving status was revoked.

¶53 The State knew Peplow wanted to plead guilty to driving while suspended or revoked and driving without insurance, and Peplow did not contest those charges at any time during the trial. However, on cross-examination of Peplow's two friends, the State explicitly asked them whether they were aware Peplow's driver's license was revoked, and also asked if they knew for how long he had been revoked. Moreover, when cross-examining Peplow, the following exchange took place:

State: Now you were driving while your license was revoked, weren't you?

Peplow: Yes.

State: How long had your license been revoked?

Peplow: Since '93, '94.

State: Now you know it's against the law to drive with a revoked license, don't you?

Peplow: Yes.

State: Nevertheless, you were doing so, correct?

Peplow: Yes.

State: Now, you didn't have any insurance on November the 18th, 1998, did you?

Peplow: No.

State: And you know it's against the law to drive without insurance, isn't that correct?

Peplow: Yes.

¶54 In addition, the jury heard Hamilton explain (once during his

testimony and once during the booking video) that if a person refuses to take a breath test under the implied consent law, his license will be either suspended or revoked. Therefore the jury was aware that a potential explanation for Peplow's revocation was a prior DUI allegation. Moreover, Peplow's driver's record which was admitted as an exhibit, was two pages long, with everything redacted from the report except the caption and lines indicating his revoked driving status.

¶55 It is important to note that, had the District Court accepted Peplow's tendered pleas of guilty prior to trial, none of this evidence would have been admissible. However, by virtue of the court's error, all of the foregoing evidence was admitted. The combination of the lengthy driver's record and the repeated explanation that a person's license may be suspended or revoked if he refuses to provide a breath sample, may have contributed to the jury's conclusion that Peplow drove under the influence, based on assumed prior conduct. Moreover, the State's specific question to Peplow concerning the length of his suspension, may have reinforced the jury's assumption Peplow had a prior DUI conviction.

¶56 ■■■ We therefore conclude the qualitative effect of the inadmissible evidence was such that there was a reasonable possibility that it might have contributed to Peplow's conviction for DUI. Accordingly, we reverse Peplow's conviction for DUI, and remand this case for a new trial as to Count I.

¶57 Further, in explaining why we abandoned the "overwhelming evidence test," for the qualitative "cumulative evidence test," we noted that a potential unintended consequence of using a quantitative approach was "inviting the State to offer inadmissible yet damaging evidence in a strong case ... ." *Van Kirk*, ¶ 35. Our review of this record shows the jury was presented with ample admissible evidence that Peplow was under the influence at the time of the accident. Thus, it was not necessary for the State to object to Peplow's guilty pleas in order to buttress the record at trial.

¶58 In conclusion, Peplow's convictions on Count II, driving while suspended or revoked, Count III, driving without insurance, and Count IV, failure to report an accident, are affirmed, while his convictions on Count I, DUI, and Count V, tampering with evidence, are reversed. Therefore, we remand this matter to the District Court for a new trial on the DUI Count, and resentencing on Counts II, III, and IV. If the retrial on Count I results in a conviction, the District Court shall resentence Peplow on that count as well.

JUSTICES NELSON, TRIEWEILER, LEAPHART and REGNIER concur.