
DA 12-0263

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 221

STATE OF MONTANA,

Plaintiff and Appellee,

v.

DONALD PAUL ROGERS,

Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 11-180
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Wade Zolynski, Chief Appellate Defender; Eileen A. Larkin, Assistant
Appellate Defender; Helena, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General; Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney; Jason Marks,
Deputy County Attorney; Missoula, Montana

Submitted on Briefs:   June 12, 2013

Decided:   August 13, 2013

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Following a three-day trial, a Missoula County jury convicted Donald P. Rogers of eight criminal counts, including sexual intercourse without consent, partner or family member assault, unlawful restraint, and violation of a no contact order. The Montana Fourth Judicial District Court subsequently sentenced Rogers to forty years at the Montana State Prison, with twenty years suspended. Rogers appeals his conviction. We reverse and remand for a new trial.

¶2 Rogers raises two issues on appeal:

¶3 *1. Did the District Court violate Rogers's constitutional rights by precluding him from cross-examining the victim about her prior acts of violence against him unless he first testified to his defense of justifiable use of force?*

¶4 *2. Did the District Court err by allowing the State to question Rogers about his prior criminal history once he testified about the victim's prior acts of violence against him?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶5 Over the course of a four-year period, Rogers and the alleged victim, S.M., engaged in an "on again, off again" romantic relationship that "had some good times and bad times"; it abruptly ended in mid-April 2011. Rogers agreed to meet with S.M. at 1:00 p.m. on April 15 to discuss their relationship as well as money Rogers owed S.M. When Rogers failed to arrive as agreed, S.M. called him and texted him numerous times. Eventually, Rogers told S.M. that he and his brother would have a drink with her at a bar

2

in Missoula.  S.M. testified that both Rogers and his brother had been drinking "quite a lot" and they were asked to leave the bar after Rogers's brother made a scene.  Rogers told S.M. to go back to her home in Arlee and he "would be there later" after he finished "hanging out with [his] brother."  S.M. continued to call and text Rogers throughout the evening of April 15 and into the early-morning hours of April 16.

¶6     S.M. testified that at approximately 3:00 that morning, she heard someone "banging" on her back door.  Rogers then called S.M. and asked her to let him into the house.  When she refused, Rogers broke into her home and "made it clear that he wanted to have . . . sexual relations[.]"  S.M. described Rogers as being "very intoxicated" and testified that he was "slurring his words."  S.M. later stated that after she asked Rogers to leave, he "hit [her] in the jaw . . . very hard" and prevented her from calling 911.  At that point, S.M. stopped resisting Rogers's advances because she was afraid he would kill her unless she complied.

¶7     Rogers "basically held [S.M.] hostage from 3:00 a.m. to 7:00 a.m."  He pinned S.M. down on her bed and, after he was unable to obtain an erection, he penetrated her with his fingers and tongue; later that morning he "masturbated over [her] head and chest."  Rogers also choked S.M. "several times" during the ordeal and, when he needed to use the bathroom, he "grabbed the back of [her] hair" and "made [her] go into the restroom with him."  S.M. tried to get Rogers to stop assaulting her by telling him that her daughter was picking up her dog at the house that morning; instead of stopping,

Rogers stated he should stay so he could have sex with S.M.'s daughter as well and then "hurt both of [them]."

¶8    At approximately 7:00 a.m., Rogers left S.M.'s house. Even though S.M. had not reported Rogers for prior instances of abuse, she immediately called 911—in part because Rogers had threatened her daughter. Missoula County Sheriff's Deputies responded to the call and arrested Rogers outside of S.M.'s residence. Deputy Scott King later recalled that S.M. was coherent, but she "had a split lip, and a bruising on her face." She told Deputy King that Rogers had sexually and physically assaulted her that morning; she also reported that Rogers had physically assaulted her in November 2010.

¶9    After his arrest, Rogers was transported to the Missoula County Sheriff's Office, where Deputy William Burt interviewed him. Rogers "adamantly" denied breaking into S.M.'s house and told the deputy that S.M. had consented to having sex with him. Although he initially denied striking S.M., when Burt noticed Rogers had blood on his hand Rogers began to cry and admitted slapping S.M. in the face. Rogers explained that he struck S.M. after she made "comments about his brother's sexual offender status."

¶10    Deputy King then filled out a seventy-two-hour no-contact order and gave it to Rogers at the county jail. Rogers admitted at trial that, even though he understood he was prohibited from contacting S.M., he violated that order several times by calling S.M. from the jail. S.M. testified that he called her five times on the day he was arrested.

¶11    On May 3, 2011, the Missoula County Attorney filed an information with the District Court charging Rogers with sexual intercourse without consent, a felony, in

4

violation of § 45-5-503, MCA; two counts of partner or family member assault, third or subsequent offense, a felony, in violation of § 45-5-206(3)(a)(iv), MCA; unlawful restraint, a misdemeanor, in violation of § 45-5-301, MCA; and four counts of violating a no-contact order by a person charged with partner or family member assault, a misdemeanor, in violation of § 45-5-209, MCA. Rogers pled not guilty before the District Court, which set his trial for the week of November 28, 2011.

¶12 Several months before trial, Rogers gave notice that he would assert a justifiable use of force defense by establishing that S.M. had a violent character. He planned to introduce evidence that the State had charged S.M. with criminal endangerment and partner or family member assault after she allegedly bit Rogers while he was driving. The State subsequently filed a motion in limine requesting that the District Court prohibit Rogers from introducing "testimony or physical evidence related to any alleged prior acts of violence of [S.M.] absent proper foundation." In the motion, the State contended that, pursuant to *State v. Daniels*, 2011 MT 278, 362 Mont. 426, 265 P.3d 623, Rogers was required to testify about his personal knowledge of S.M.'s past acts of violence prior to any testimony regarding S.M.'s character for violence. Rogers responded that he understood the ruling of *Daniels* and was confident he could lay the necessary foundation to permit introduction of the victim's violent history with Rogers. Rogers's counsel indicated that he proposed to make an offer of proof outside the presence of the jury "[t]o facilitate the resolution of this issue." The response did not identify any constitutional issues for the court's consideration or offer other legal argument.

¶13 Immediately prior to trial, Rogers's attorney, Chris Daly, presented a proposal for how he intended to satisfy *Daniels* prior to cross-examining S.M. about her allegedly violent character:

> [A]t some point before the alleged victim testifies, we would—out of the presence of the jury—I would put on an offer of proof for the Court to hear what evidence we would, in fact, intend to put forward, and, then, the Court [could] see if that satisfies the requirements of *Daniels*. And, then, we would be able to proceed with cross-examination of [S.M.].

¶14 The State objected to the proposal, asserting that pursuant to *Daniels*, Rogers could not cross-examine S.M. about her violent character until he testified before the jury and established that his knowledge of S.M.'s prior acts of violence served as the basis for his decision to defend himself by striking S.M. Daly offered that it would be "more efficient" to proceed with the offer first, "so the Court would know what we[']re going to say, . . . and then do the cross-examination of [S.M.], knowing that Mr. Rogers has already said what he was going to say." The District Court took the issue under advisement and stated it would not issue a ruling until it had read *Daniels*.

¶15 After the State made its opening statement, the prosecution again requested that the court rule on its outstanding motion in limine. Rogers's attorney reiterated his position: "[W]hat I'd actually like to do with that is to do an offer of proof, so the Court could hear exactly what Mr. Rogers intends to testify, with regard to that, so that there's no surprises or objections at the time of his testimony." The District Court granted the State's motion in limine; it reasoned that the only way Rogers could satisfy the requirements in *Daniels* was to testify and lay the appropriate foundation in front of the

jury. Daly attempted to persuade the court one last time, stating that for the sake of "judicial economy," he preferred to make an offer of proof establishing what Rogers would later testify to because "otherwise, if we have to wait until Mr. Rogers takes the stand, as part of our case-in-chief, then I would . . . have to recall [S.M.]." The District Court stated it "[didn't] think judicial economy [was] going to carry the day" and agreed that, pursuant to *Daniels*, the proper procedure was to raise the issue of justifiable use of force through Rogers's testimony, and then to recall S.M. during Rogers's case-in-chief. Daly did not object to the District Court's decision on the ground that Rogers may choose not to testify. S.M. testified during the State's case-in-chief, and Daly cross-examined her, but not about the actions that led the State to charge her with partner or family member assault.

¶16 The next day, during a recess taken just prior to the close of the State's case-in-chief, Daly made an offer of proof to the court detailing what Rogers's testimony would be so that the court could establish what the "ground rules" would be for his self-defense testimony. Daly explained that Rogers "will testify that knowing this [violent] history of [S.M.], that's why he felt he needed to use the force he did." The court then asked whether S.M.'s "violent acts" Rogers would testify about were directed toward Rogers. After learning that they were, the Court ruled it would "allow any evidence of prior violence between the parties by the Defendant, or by the State." The court informed the prosecution that "once the defendant opens the door, you're free to go where you want."

7

The District Court then allowed Daly to confer with Rogers for the remaining four minutes of the recess.

¶17    At the end of the recess, the court stated that it wanted to further clarify its ruling: "I just want to be certain that Mr. Rogers knows that once he [testifies about S.M.'s prior violent acts towards him], his prior criminal history comes into play." Daly asked the court whether that meant his criminal history involving S.M., or his entire criminal history. The District Court responded that it meant any violent acts committed by Rogers: "If you talk about violence, any act of violence that you committed against another person is relevant and admissible."

¶18    Rogers then voiced his objection to this ruling, telling the court that it was "leaving [him] no choice—with no defense—is what [it's] leaving me" because he had an extensive criminal history, even though he asserted that he had been "clean for ten [or] twelve years." Daly then asked Rogers whether, in light of the court's decision, he still wanted to proceed with his justifiable use of force defense and testify about S.M.'s past acts of violence. Rogers responded: "Well, you better stand up, and tell them I'm a piece of shit, and I've been in a lot of trouble in my life because I'm going to tell them the truth. I'm going to tell them how crazy [S.M.] is, and how violent she is."

¶19    Rogers took the stand in his own defense. He explained that S.M. let him into her house and they proceeded to have consensual sexual relations. Rogers denied ever restraining S.M., choking her, or grabbing her by the hair. Rogers also testified that S.M. woke him up in the morning and asked him to leave because her daughter, who

8

"despised" Rogers, was coming to the house. When he refused to leave, Rogers explained, she "blew a gasket" and became "violently upset" and started hitting him and clawing at him. Rogers then stated that he defended himself by slapping S.M. and pushing her away, and that he then ran out of the house in his boxer shorts to escape S.M. Daly then asked Rogers if he ever had experienced this sort of reaction from S.M. Rogers replied by acknowledging that if he answered the question, he would "have to tell you people all about me and my past"; he then discussed previous times that S.M. physically had attacked him.

¶20     On cross-examination, the prosecutor—Jason Marks—asked Rogers a series of questions about his criminal history. Marks began his cross-examination by asking, "when you said you have kind of a checkered past, that didn't quite cover the whole story, did it?" Rogers then asked, "Do you want to prosecute me on my past or this charge?" Marks stated: "You've got two prior partner assaults that you were convicted of?" Rogers admitted that was true, and volunteered a detailed account of the factual circumstances that gave rise to the convictions. Marks proceeded, stating: "I'm assuming those [bar fights] are the misdemeanor assaults on your record?" Rogers answered that was correct. Marks then asked whether Rogers had been convicted of "felony assault and use of a weapon" and Rogers answered that those charges were "dismissed in court,

eventually."[1]   Marks also questioned Rogers about a 2008 partner or family member assault conviction, but Rogers replied that he had no recollection of such a conviction.

¶21   Marks then asked Rogers: "[A]nd how many women is it you've been charged with raping?"  Rogers answered: "Oh, five, ten, twenty—I don't know. You tell me—actually, two—years ago.  Fifteen years ago, I was accused of it.  I was acquitted of it, and charges were dismissed, and [S.M.'s] . . . ."  At that point, Marks interrupted Rogers and stated: "You were convicted at trial, and it went up [and was reversed] on appeal. Let's be clear."[2]

¶22   The jury returned a verdict convicting Rogers of all eight counts charged.

### STANDARD OF REVIEW

¶23   For questions regarding constitutional law, our review is plenary.  *Daniels*, ¶ 11. A district court's ruling on evidentiary matters generally is reviewed for an abuse of discretion; however, "to the extent the [district] court's ruling is based on an interpretation of an evidentiary rule or statute, the ruling is reviewed de novo."  *State v. Stewart*, 2012 MT 317, ¶ 23, 367 Mont. 503, 291 P.3d 1187; *see also Daniels*, ¶ 11.

---

[1] We reversed Rogers's felony assault with a weapon conviction and remanded the case for a new trial because Rogers "established both error and prejudice under the *Strickland* test for ineffective assistance of counsel."  *State v. Rogers*, 2001 MT 165, ¶ 23, 306 Mont. 130, 32 P.3d 724.  Rogers's criminal record does not indicate he was convicted of those charges on remand.

[2] We reversed Rogers's sexual intercourse without consent conviction because "the District Court abused its discretion in admitting testimony about previous sexual assaults by Rogers." *State v. Rogers*, 1999 MT 305, ¶ 43, 297 Mont. 188, 992 P.2d 229.

**DISCUSSION**

¶24    *1. Did the District Court violate Rogers's constitutional rights by precluding him from cross-examining the victim about her prior acts of violence against him unless he first testified to his defense of justifiable use of force?*

¶25    Rogers contends that the District Court "erred and violated [his] constitutional rights by precluding him from questioning [S.M.] about her past violence against him unless and until he testified." He argues that the District Court's ruling forced him "into the intolerable position of choosing between his right to present a defense . . . [by cross-examining] the State's principal witness against him, and his right not to testify." This error violated his rights guaranteed by the Fifth Amendment of the United States Constitution, Rogers argues, as well as his right to cross-examine adverse witnesses found in the Confrontation Clause of the Sixth Amendment and Article II, Section 24 of the Montana Constitution.

¶26    The State asserts that Rogers waived his constitutional claim that the District Court's ruling impermissibly required him to testify before cross-examining S.M. about her prior acts of violence. Instead of objecting that he was being forced to choose between competing constitutional rights, the State argues, "Rogers asserted that as a matter of *judicial economy*, it simply made more sense for Rogers to make an offer of proof about his intended testimony" so that he could cross-examine S.M. about those acts, rather than recalling her during his case in chief. (Emphasis in original.) The State maintains that Rogers always "expressed to the district court a firm intention to testify,

and indicated that his offer of proof to lay the proper foundation to introduce character evidence of S.M. would constitute his intended testimony." We agree with the State that Rogers failed to preserve this issue for appeal.

¶27 Generally, a "'defendant must make a timely objection to properly preserve an issue for appeal.'" *Daniels*, ¶ 31 (quoting *State v. Paoni*, 2006 MT 26, ¶ 35, 331 Mont. 86, 128 P.3d 1040); *see also* §§ 46-20-104(2) and -701, MCA. To be timely, the objection "must be made as soon as the grounds for the objection are apparent." *Schuff v. Jackson*, 2002 MT 215, ¶ 30, 311 Mont. 312, 55 P.3d 387. "Failure to lodge a timely objection constitutes a waiver of the objection and precludes raising the issue on appeal." *State v. Sittner*, 1999 MT 103, ¶ 13, 294 Mont. 302, 980 P.2d 1053. Our consistent application of the timely-objection rule has been motivated by concerns of judicial economy and fundamental fairness, both of which require alleged errors to be brought to the attention of the district court "so that actual error can be prevented or corrected at the first opportunity." *State v. West*, 2008 MT 338, ¶ 17, 346 Mont. 244, 194 P.3d 683 (citation omitted).

¶28 The District Court determined on the first day of trial that Rogers would have to testify and establish a foundation for his justifiable use of force defense before he could cross-examine S.M. about her prior violent acts. Rogers did not alert the court to any constitutional concerns in his response to the State's motion in limine, nor did he object on that basis to the court's ruling during trial. The District Court asked Daly if he disagreed with the ruling. Daly stated: "Well I just think, as a matter of—like I say—of

12

judicial economy, we could do it the way I suggested." The court disagreed, stating that "judicial economy [was not] going to carry the day." Furthermore, Daly repeatedly stated that Rogers intended to testify and offered no objection to his doing so, undermining Rogers's argument on appeal that the District Court forced him to choose between exercising his constitutional right to not testify and his right to cross-examine S.M. *See Daniels*, ¶ 35. Because Rogers failed to timely object to the District Court's ruling and because he did not argue that he could not be compelled to testify prior to asserting a justifiable use of force defense, we decline to consider his constitutional arguments on appeal.

¶29 *2. Did the District Court err by allowing the State to question Rogers about his prior criminal history once he testified about S.M.'s prior acts of violence against him?*

¶30 Rogers asserts that the District Court "erred and prejudiced [him] by allowing the State to inquire into his past criminal history, including matters that were reversed on appeal." He contends that, in doing so, the District Court violated M. R. Evid. 404(b), which generally prohibits the admission of an individual's criminal history into evidence without justification. Rogers claims that the District Court "erred by going beyond" an examination of his relationship with S.M. and "opening up [his] criminal history to cross-examination." Rogers argues that the error prejudiced his right to a fair trial.

¶31 Rule 404(b) does not bar evidence, but prohibits a "theory of admissibility." *Stewart*, ¶ 61. Evidence of other crimes, wrongs or acts may not be admitted to prove the defendant's character, disposition or propensity in order to show that he acted in

13

conformity with that character at the time of the offense in question. *Stewart*, ¶ 61. Thus, "'if the necessary logical steps [in the prosecutor's theory of admissibility] include an inference of general character or propensity, or if it seems likely that the proof will be used to support such an inference,' then the principle of exclusion applies." *Stewart*, ¶ 61 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence vol. 1, § 4:28, 746-47 (3d ed., Thomson/West 2007)). As a general rule, evidence of other crimes, wrongs, or acts must be excluded because "'prior acts or crimes are highly prejudicial to the defendant, and usually irrelevant for purposes of the charged crime.'" *State v. Derbyshire*, 2009 MT 27, ¶ 51, 349 Mont. 114, 201 P.3d 811 (quoting *State v. Croteau*, 248 Mont. 403, 407, 812 P.2d 1251, 1253 (1991), and citing *State v. Ray*, 267 Mont. 128, 133-34, 882 P.2d 1013, 1016 (1994)); *see also State v. Lacey*, 2010 MT 6, ¶ 31, 335 Mont. 31, 224 P.3d 1247 (citing M. R. Evid 404(b)). Proof that the "accused committed other crimes, even if they were of like nature to that charged, is not admissible to show his depravity or criminal propensities, or the resultant likelihood of his committing the offense charged[.]" *State v. Tiedemann*, 139 Mont. 237, 242, 362 P.2d 529, 531 (1961). These inquiries are prohibited because of fears that a jury will "prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127, 13 P.3d 376 (quoting *Michelson v. U.S.*, 335 U.S. 469, 475-76, 69 S. Ct. 213, 218 (1948)).

¶32    This rule barring proof of other crimes "'should be strictly enforced in all cases where applicable, because of the prejudicial effect and injustice of such evidence, and

should not be departed from except under conditions which clearly justify such a departure.'" *Derbyshire*, ¶ 22 (quoting *Tiedemann*, 139 Mont. at 242-43, 362 P.2d at 531). We have applied this rule to ensure that a defendant is not convicted "'merely because he is an unsavory person' or on the rationale that because he committed a crime in the past, he has a defect of character that makes him more likely than people generally to have committed the charged offense." *Derbyshire*, ¶ 22 (quoting *Gowan*, ¶ 19). "Essentially, Rule 404(b) disallows the inference from bad act to bad person to guilty person." *State v. Dist. Ct. of the Eighteenth Jud. Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415.

¶33 The State does not argue in this case that evidence of Rogers's prior crimes properly was admissible for any of the other purposes identified in the rule, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). Rather, it argues that Rogers did not make a specific objection on 404(b) grounds, that Rogers has not specifically identified which of the prosecutor's questions were objectionable, and that the evidence was admissible for impeachment because Rogers testified that he had not been in trouble for the last twelve years. Finally, the State argues that any error was harmless.

¶34 Initially, we reject the State's impeachment argument, since Rogers only testified about his prior record after the District Court had ruled that the State could offer that evidence once he raised justifiable use of force. We also disagree with the State that Rogers did not object to the court's ruling. As soon as he learned that the prosecution

15

would be allowed to introduce his criminal history if he presented a justifiable use of force defense, he protested, stating: "The Court is leaving me no choice—with no defense—is what they're leaving me." When the State began to question Rogers about his criminal history, Rogers objected once more, asking the prosecutor: "Do you want to prosecute me on my past, or this charge?" These statements were sufficient to put the State and the court on notice that Rogers was objecting to the introduction of his criminal history and to preserve his objection for appeal. *See Pumphrey v. Empire Lath & Plaster*, 2006 MT 99, ¶ 30, 332 Mont. 116, 135 P.3d 797. Likewise, Rogers's brief on appeal makes clear the basis for his claimed error.

¶35 Neither the District Court in its ruling nor the State, either at trial or on appeal, offered any basis for admissibility of Rogers's entire violent criminal history once he asked S.M. about her past acts of violence. Our review of the record reveals none. We agree with Rogers that the evidence was not admissible under Rule 404(b) as it was likely to be used to support an inference of character or propensity and was not shown to be admissible for another purpose. *See Stewart*, ¶ 61, *Derbyshire*, ¶ 55. A cause may not be reversed by reason of any error committed by the trial court, however, "unless the record shows that the error was prejudicial." Section 46-20-701(1), MCA.

¶36 We have adopted a two-step analysis to determine whether an error "prejudiced the criminal defendant's right to a fair trial and is therefore reversible." *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735.

16

¶37     The first step in this analysis is determining whether the claimed error is categorized as "structural error" or "trial error." *Van Kirk*, ¶ 37. Structural error "affects the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Van Kirk*, ¶ 38 (citation omitted). Structural error is "typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding." *Van Kirk*, ¶ 38. Trial error, on the other hand, "typically occurs during the presentation of a case to the jury." *Van Kirk*, ¶ 40. If an error was structural, it is presumptively prejudicial and we automatically reverse the verdict. *Van Kirk*, ¶¶ 38, 41. If, however, the error is "the more 'typical' trial error," we do not automatically reverse the conviction; instead, we proceed to the second step of our analysis—determining whether the error was harmless under the circumstances." *Van Kirk*, ¶ 41. The error Rogers identifies on appeal took place during the presentation of evidence to the jury. As such, it "is amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other evidence introduced at trial" and is trial error. *Van Kirk*, ¶ 40; *Stewart*, ¶ 45.

¶38     When determining whether an error in the admission of evidence was harmless, we apply the "cumulative evidence test." *Van Kirk*, ¶ 43. This test requires a qualitative analysis of the evidence; thus, it "looks not to the quantitative effect of other admissible evidence, but rather to whether the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence proved." *Van Kirk*, ¶ 43 (emphasis omitted). If there was no other admissible evidence proving the same facts that the

17

tainted evidence proved, the analysis turns on whether the tainted evidence went to the proof of an element of the crime charged or, by contrast, to some fact not involving an element of the crime. *Van Kirk*, ¶ 47. "If there was no cumulative evidence presented as to a fact proving an element of the crime charged, then the error in admitting the tainted evidence which proved that element cannot be considered harmless, the qualitative assessment is never reached, and the court's decision will be reversed." *Van Kirk*, ¶ 47. Conversely, "[i]f the evidence in question did not prove an element of the crime, then the State must demonstrate that, qualitatively, there is no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction." *Van Kirk*, ¶ 47; *see also State v. McComber*, 2007 MT 340, ¶ 26, 340 Mont. 262, 173 P.3d 690 (citing *State v. Peplow*, 2001 MT 253, ¶¶ 49, 51, 307 Mont. 172, 36 P.3d 922).

¶39 The State contends, and we agree, that its cross-examination of Rogers about his criminal history "clearly was not for the purpose of proving an element of the offense." Nonetheless, the State cites to *State v. Stewart* in support of its position that the erroneous admission of this evidence was qualitatively harmless. There, we applied the cumulative evidence test where the prosecution had erred by admitting evidence for the purpose of proving an element of the charged offense, "that Stewart knowingly had sexual intercourse or sexual contact with [the victim]." *Stewart*, ¶ 47. Importantly, we were able to evaluate the tainted evidence against "admissible evidence that proved the same facts." *Stewart*, ¶ 48. Doing so, we concluded that, qualitatively, "nothing [in the tainted evidence] is any more inflammatory or prejudicial than the other, admissible evidence at

18

trial." *Stewart*, ¶ 50. That is not the situation here. There was no admissible evidence proving Rogers's entire history of violence; his criminal history was not an admissible fact for the jury's consideration. For this reason, *Stewart* is not on point.

¶40 *Stewart* aside, the State stresses—in support of its argument that there is no reasonable possibility that introducing Rogers's criminal history may have contributed to his conviction—that it did not introduce Rogers's criminal history during its case-in-chief, it did not dwell on his criminal history during the cross-examination, and it did not mention his past violent acts in its closing argument. The State also points out that, when the prosecution asked Rogers about his criminal history, it encouraged Rogers to provide "yes" or "no" answers and that Rogers "chose to portray himself in a negative light to the jury by using offensive language"[3] and by offering facts that led to some of his past convictions. These observations do not satisfy the State's burden under *Van Kirk*.

¶41 When discussing how the State might demonstrate that no reasonable possibility exists that the admission of tainted evidence might have contributed to the defendant's conviction in *Van Kirk*, we presented two hypothetical scenarios. *Van Kirk*, ¶ 46. In the first scenario, the State offered evidence during a DUI trial that the defendant was a convicted child molester. *Van Kirk*, ¶ 46. On appeal, the State would have to demonstrate that there was no reasonable possibility that introducing this evidence led to the defendant's conviction, "a virtually impossible burden to carry, given the highly

---

[3] For example, Rogers stated during his testimony that the prosecutor was "fucking pitiful," he referred to S.M.'s daughter as a "c-u-n-t[,]" and he referred to S.M. as a "shrew" whom he could not "tame."

19

inflammatory nature of child molestation evidence." *Van Kirk*, ¶ 46. Conversely, in the second hypothetical, the State erred by offering evidence that the same defendant previously had declared bankruptcy. *Van Kirk*, ¶ 46. We speculated that, in such a scenario, the State would be able to carry its burden because it is unlikely that an allegation of bankruptcy is the sort of defect in character that would lead a jury to believe that the defendant likely committed the charged offense. *Van Kirk*, ¶ 46.

¶42 We consistently have applied this framework in subsequent cases. In *State v. Derbyshire*, the State elicited testimony from its witnesses that they were "probation officers" and that the defendant "was on probation" when he was arrested. *Derbyshire*, ¶ 55. We held that these statements were "not admissible under Rule 404(b)." *Derbyshire*, ¶ 55. The defendant's status as a probationer was not an element of the charges against him. We concluded that the State failed to satisfy its burden under *Van Kirk* because "in terms of quality, the tainted evidence here was highly prejudicial" and there was a reasonable possibility that the jury's knowledge that the defendant had committed past crimes contributed to a guilty verdict. *Derbyshire*, ¶¶ 51, 53.

¶43 In *State v. Peplow*, the district court erred by allowing the State to introduce evidence that the defendant had been driving with a suspended license and had no insurance when he was arrested for driving under the influence. *Peplow*, ¶ 48. The tainted evidence suggested that the defendant had been convicted of similar past crimes and did not prove an element of the charged crime. *Peplow*, ¶¶ 51, 55. We reversed the defendant's conviction and remanded the case for a new trial because the State was

20

unable to satisfy its burden under *Van Kirk*. *Peplow*, ¶ 56. Similarly, in *State v. Nolan*, the district court erred by allowing the State to introduce evidence that the defendant—who had been charged with bail-jumping—had fathered five children with four different women, none of whom he had married; the State also introduced evidence that the defendant had worked as a pimp. *State v. Nolan*, 2003 MT 55, ¶¶ 19-20, 314 Mont. 371, 66 P.3d 269. We held that this evidence was "highly inflammatory and prejudicial" and that the State had failed to carry its burden pursuant to *Van Kirk*. *Nolan*, ¶¶ 25-26. Consequently, we reversed Nolan's conviction and remanded the case for a new trial. *Nolan*, ¶ 27.

¶44 In this case, the State introduced "highly inflammatory" evidence that Rogers had a prior rape conviction, which had been reversed on appeal, as well as evidence that he had been convicted of other crimes, in violation of M. R. Evid. 404(b). *See Van Kirk*, ¶ 46; *see also Derbyshire*, ¶ 55. Upon our review of the record, we conclude that there is a reasonable possibility the tainted evidence influenced Rogers's conviction. The prosecutor questioned Rogers about two serious felony convictions that later were reversed. In the course of that questioning, the State informed the jury that Rogers previously had been convicted of rape and felony assault with a weapon, and had gotten both convictions set aside. This invited an opportunity for the jury to make sure Rogers would be punished when it deliberated on crimes charged. The law prohibits the State from introducing evidence of past crimes because doing so denies individuals a fair

21

opportunity to defend against the charged crimes. *Gowan*, ¶ 19. In light of the nature of the evidence presented, the error was not harmless.

¶45 In *Van Kirk*, we rejected our previous standard that "overwhelming evidence of a defendant's guilt can render harmless a district court's error" because it "invit[es] the State to offer inadmissible yet damaging evidence in a strong case . . . since the worst that can happen is that the error is noted but deemed harmless." *Van Kirk*, ¶¶ 33-35. Our review of the record in this case "shows [that] the jury was presented with ample admissible evidence" that Rogers had committed the charged crimes. *Peplow*, ¶ 57. Nonetheless, the State's introduction of Rogers's criminal history, including convictions overturned by an appellate court for legal error, violated Rogers's right to a fair trial.

¶46 The judgment is reversed and the case is remanded to the District Court for a new trial on all charges.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS