No. 02-638

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 137

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

KELLY JAMES TETERS,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 2001-74,
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Gordon H. Williams, Attorney at Law, Bozeman, Montana

       For Respondent:

           Honorable Mike McGrath, Attorney General; Ilka Becker, Assistant
Attorney General, Helena, Montana

           Marty Lambert, County Attorney; Ashley Harrington,  Deputy County
Attorney, Bozeman, Montana

Submitted on Briefs:  June 19, 2003

Decided:   May 25, 2004

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Kelly James Teters (Teters) appeals from a jury verdict rendered in the Eighteenth Judicial District Court, Gallatin County, finding him guilty of sexual intercourse without consent.  We affirm.

¶2     The issues raised on appeal are as follows:

¶3     1. Did the District Court err in denying Teters' motion to exclude his wife's testimony that he was abusive?

¶4     2. Did the District Court err in allowing evidence of the victim's prior consistent statements?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     In early October 2000, Officer Roy Edwards (Officer Edwards) of the Mapleton City Police Department in Mapleton, Utah, was contacted by an official at the Church of Jesus Christ of Latter Day Saints (LDS) who reported that a female member of his congregation had been sexually abused by a family member.  The church official identified the victim as seventeen-year-old, J.U.

¶6     Officer Edwards met with J.U. at her school shortly thereafter to discuss the reported abuse.  During the interview, J.U. disclosed that she had been sexually abused by her stepfather, Kelly Teters, during the twenty-five month period the family resided in Manhattan, Montana.  Edwards reported the allegations of sexual abuse to the Gallatin County Sheriff's Department.

¶7 On May 2, 2001, Kelly James Teters was charged in District Court with the offenses of sexual intercourse without consent, a felony in violation of § 45-5-503, MCA, and intimidation, a felony in violation of § 45-5-203(1), MCA. Teters pleaded not guilty to both charges.

¶8 A jury trial was held on March 12 and 13, 2002. At trial, J.U. testified that the sexual abuse began in 1997, shortly after the family arrived in Montana, and continued until some time in 1999. She relayed an incident occurring in 1997 at a workshop located near the family home in Manhattan. J.U. had received a phone call from Teters requesting she come down to the shop. When she arrived, Teters pushed her into a parts room and shoved her up against a bench. As he held her there, he pulled down her pants and underwear, removed his own clothing, and began rubbing his penis against J.U.'s buttocks. J.U. was thirteen years old at the time.

¶9 J.U. also testified that this was not the only time Teters touched her sexually in the parts room of the workshop. During several of these encounters, J.U. recalled Teters had inserted his fingers into her vagina. She also relayed an incident in which Teters offered her $100 to perform oral sex. J.U. eventually gave in to his requests.

¶10 Similar incidents of sexual abuse continued into the spring of 1999. Rex Dahl (Dahl), Stake President of the Bozeman, Montana LDS church, testified that he met with Teters on approximately eight occasions from April to August, 1999. During the course of these meetings, Teters disclosed that he had been sexually abusing J.U. for approximately two years. President Dahl recalled one occasion in which Teters brought J.U. to the meeting

so that she could discuss the events taking place with her stepfather. J.U. told President Dahl that Teters would often take her to a private room and lie on top of her with his pants down. J.U. indicated that these instances occurred when she was alone with Teters and that there was usually no one around to respond to her cries for help. Although Dahl was concerned for the child, he believed his duty of confidentiality prevented him from reporting the abuse. Rather, Dahl instructed J.U. to contact the appropriate church authorities if the abuse continued.

¶11 Following her meeting with President Dahl, J.U. disclosed the abuse to her mother, V.U. Several months later, in the early morning hours of August 19, 1999, V.U. took J.U. and the other children to a shelter. She later obtained a protective order preventing Teters from coming near her or the children. By that Christmas, however, V.U. had reconciled with Teters, and the family resumed living together in Idaho and later in Utah.

¶12 In its opening statement at trial, the State informed the jury that V.U. would testify that her relationship with Teters was verbally and physically abusive. Defense counsel objected to the introduction of such testimony on the basis of relevance and lack of prior notice. The court overruled the objection, and V.U. testified that Teters frequently threatened to punish her and the children for disobeying him and would occasionally follow through on his threats by pushing or shoving her into a room and preventing her from leaving the house. During times when the abuse was at its worst, Teters threatened to hunt V.U. down and kill her if she ever tried to leave him. V.U. also testified that Teters often

became physically abusive to the children, and recalled instances in which Teters kicked and slapped the children for disobeying him.

¶13     J.U. similarly testified that Teters threatened to kill her if she ever told anyone, particularly her mother, about the sexual encounters.  J.U. explained that she performed Teters' requests for sexual acts because she was scared that he would hurt her if she refused.

¶14     At trial, Teters testified that he had sexual contact with J.U. on approximately ten to fifteen different occasions.  However, Teters denied that penetration occurred during any of these instances.  On cross-examination, Teters testified that J.U. had fabricated her story with regard to performing oral sex and was mistaken in her belief that he had digitally penetrated her vagina.  Furthermore, Teters denied that J.U. exhibited any fear of him, insisting she was a willing partner because she continued to "come around the shop."

¶15     Following Teters' testimony, the State called Darin Burdette (Burdette) of Child Protective Services for the State of Utah.  Burdette, who had interviewed J.U. concerning the allegations of sexual abuse in March 2001, began to testify to what J.U. had disclosed to him during the interview.  Defense counsel objected to this line of questioning on the basis of hearsay and, after much discussion in chambers, the District Court overruled the objection.  Burdette thereafter testified that J.U. had told him that Teters penetrated her mouth with his penis and had inserted his fingers into her vagina on five to ten different occasions.

¶16     On March 13, 2002, the jury found Teters guilty of sexual intercourse without consent.  However, the jury acquitted Teters of the intimidation charge.  On May 16, 2002,

Teters received a twenty-year sentence at the Montana State Prison, with ten years suspended on conditions. This appeal followed.

## STANDARD OF REVIEW

¶17 This Court's standard of review of rulings on the admissibility of evidence is whether the district court abused its discretion. *State v. Castle*, 1999 MT 141, ¶ 11, 295 Mont. 1, ¶ 11, 982 P.2d 1035, ¶ 11. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *State v. Monaco* (1996), 277 Mont. 221, 225, 921 P.2d 863, 866.

## DISCUSSION

¶18 **Did the District Court err in denying Teters' motion to exclude his wife's testimony that he was abusive?**

¶19 Teters contends that V.U.'s testimony concerning his history of verbal and physical abuse constituted evidence of previous crimes, wrongs, or acts, as provided under Rule 404(b), M.R.Evid. He maintains that, under the procedural protections adopted by this Court in *State v. Just* (1979), 184 Mont. 262, 602 P.2d 957, and later modified in *State v. Matt* (1991), 249 Mont. 136, 138, 814 P.2d 52, 54, the State was required to provide notice of its intent to introduce such evidence prior to trial. Having failed to do so, Teters argues that V.U.'s testimony was improperly admitted. However, we conclude the alleged error was harmless, and therefore need not address whether V.U.'s testimony was properly admitted under Rule 404(b), M.R.Evid.

¶20    Section 46-20-701(1), MCA, provides that "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." To determine whether an alleged error prejudices a criminal defendant's right to a fair trial and is therefore reversible, we employ a two-part analysis. *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, ¶ 37, 32 P.3d 735, ¶ 37. In the first step of the analysis, we classify the alleged error as either structural or trial error. *Van Kirk*, ¶ 37. Structural errors implicate violations of fundamental rights, such as the right to an impartial trial judge, right to counsel, and right to a jury trial, and result in automatic reversal. *See State v. Weldele*, 2003 MT 117, ¶ 60, 315 Mont. 452, ¶ 60, 69 P.3d 1162, ¶ 60. Trial errors, on the other hand, are not presumptively prejudicial and do not require automatic reversal. *Weldele*, ¶ 61. In this case, the alleged error occurred when V.U. testified at trial concerning Teters' history of abuse and, as such, would be classified as trial error.

¶21    The next step of the analysis is to determine whether there was a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction. *Van Kirk*, ¶ 47. Ordinarily, for this Court to conclude the error is "harmless," the State must demonstrate that the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence, or otherwise establish that, qualitatively, there was no reasonable possibility that the tainted evidence contributed to the defendant's conviction. *Van Kirk*, ¶ 47. In this case, however, Teters was acquitted of the charge for which the allegedly erroneous evidence was admitted. Furthermore, V.U.'s testimony concerning

7

Teters' history of verbal and physical abuse did not involve any element of the offense of sexual intercourse without consent. Accordingly, assuming *arguendo* V.U.'s testimony concerning the abuse was improperly admitted, we conclude the error was harmless, and therefore affirm the trial court.

¶22 **Did the District Court err in allowing evidence of the victim's prior consistent statements?**

¶23 In his opening statement at trial, defense counsel alluded to the possibility that J.U. had been improperly influenced by her mother in forming the allegations of sexual abuse.

He stated,

> [J.U.] will tell you that she wanted nothing to do with this; this is not her idea. Those things happened between she and Kelly. They had that kind of relationship. She'll tell you that its [V.U.] that caused this whole thing to get blown up out of proportion. Ladies and gentlemen, you will be injected into the middle of a messy divorce. I ask you to keep in mind the motives of the parties in examining their testimony. I would ask you to consider what each party has to gain by their testimony.

During cross-examination of the victim, defense counsel challenged J.U.'s testimony concerning the sexual abuse and implied that she had a motive to fabricate her story as a result of her hatred for the defendant. Teters additionally testified that he never penetrated the victim and denied offering J.U. money in exchange for oral sex. In rebuttal, the State was allowed to introduce evidence of J.U.'s prior consistent statements through the testimony of Darin Burdette of the Utah Child and Protective Services. Burdette, who had interviewed J.U. concerning the allegations of sexual abuse in March 2001, testified that J.U.

8

disclosed to him that Teters had penetrated her mouth with his penis and had inserted his fingers into her vagina on numerous occasions.

¶24    On appeal, Teters asserts the District Court erred in permitting Burdette to testify concerning the out-of-court statements J.U. made to him in March 2001.  He argues that Burdette's testimony constituted hearsay because J.U.'s testimony had not been impeached and, therefore, evidence of her prior consistent statements was not admissible.

¶25    As a general rule hearsay statements are not admissible.  Rule 802, M.R.Evid. However, pursuant to Rule 801(d)(1)(B), M.R.Evid.,

> A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence, or motive.

Thus, four requirements must be satisfied before prior statements qualify for admission under this rule: (1) the declarant must testify at trial and (2) be subject to cross-examination concerning her statement, and (3) the statements to which the witness testifies must be consistent with the declarant's testimony, and (4) the statement must rebut an express or implied charge of subsequent fabrication, improper influence or motive. *State v. Mensing*, 1999 MT 303, ¶ 10, 297 Mont. 172, ¶ 10, 991 P.2d 950, ¶ 10. *See also State v. Scheffelman* (1991), 250 Mont. 334, 338, 820 P.2d 1293, 1296.

¶26    Clearly, the first three factors have been met in this case: J.U. testified, and was subject to cross-examination, concerning her statement that Teters had penetrated her orally and vaginally.  These statements were consistent with Burdette's testimony in which he recalled his interview with J.U.   However, Teters argues that these statements, though

consistent, were not admissible because they were not offered in response to a charge of improper motivation or subsequent fabrication.

¶27    In *State v. Lunstad* (1993), 259 Mont. 512, 516, 857 P.2d 723, 726, we emphasized that prior consistent statements are admissible only when a specific motive to fabricate is alleged and the prior consistent statements were made before the time the alleged motive to fabricate arose.  In the present case, defense counsel launched a general attack on J.U.'s credibility by insinuating that she possessed a motive to fabricate her testimony, and that she had been improperly influenced by her mother.  Although implied, these charges of improper motive and influence were sufficient to satisfy the fourth requirement of Rule 801(d)(1)(B), M.R.Evid.

¶28    Furthermore, the consistent statements were made prior to the time the alleged motivation to fabricate arose.  *See Lunstad*, 259 Mont. at 516, 857 P.2d at 726.  In his opening statement, defense counsel implied that J.U. had been subject to the improper influence of her mother, who was in the midst of a "messy divorce" from Teters.  However, J.U.'s statements to Burdette occurred prior to the parties' separation in April 2001, and well before the commencement of divorce proceedings.  Accordingly, J.U.'s statements were made prior to the alleged motivation to fabricate arose, and are admissible under Rule 801(d)(1)(B), M.R.Evid.  We therefore hold the District Court did not err in admitting Burdette's testmony concerning J.U.'s prior consistent statements of sexual abuse.

¶29    Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM REGNIER