05-276

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 340

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

COBY ROBERT McOMBER,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Third Judicial District,
                    In and For the County of Powell, Cause No. DC 2004-15
                    Honorable Ted L. Mizner, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

                Jim Wheelis, Chief Appellate Defender, Kristina Neal, Assistant Appellate
                Defender, Helena, Montana

        For Appellee:

                Hon. Mike McGrath, Montana Attorney General, Pamela P. Collins
                Assistant Attorney General, Helena, Montana

                Christopher G. Miller, Powell County Attorney, Deer Lodge, Montana


                        Submitted on Briefs:  June 1, 2006

                                   Decided:  December 17, 2007


Filed:

                              _____
                                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Appellant Coby Robert McOmber appeals from his conviction in the District Court for the Third Judicial District, Powell County, of one count of felony solicitation to commit the offense of issuing a bad check. McOmber's appeal concerns the District Court's decision allowing the State to introduce, as prior consistent statements, a written statement and a police-interview transcript of a testifying witness, Bill Peltier. We affirm.

¶2 The issues on appeal are as follows:

1. Were Peltier's written statement and his statements reflected in the police-interview transcript admissible as prior consistent statements under M. R. Evid. 801(d)(1)(B)?

2. If the statements were inadmissible, was their admission by the District Court harmless error?

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 On November 4, 2003, the State charged McOmber with misdemeanor theft. McOmber was arrested on November 26, 2003, and pleaded not guilty, but was unable to post bond. McOmber was incarcerated in the Powell County jail on a total bond set at approximately $1,600, which included bonds from Cascade County and Powell County.

¶4 On or about November 30, 2003, McOmber called his friend Bill Peltier. According to Peltier's testimony at trial, McOmber phoned him from the Powell County jail around 11:30 a.m. and asked him to contact a number of bail bondsmen. Peltier stated that the bondsmen he called all refused to post bond for McOmber. Peltier testified

2

that McOmber later called back to discuss other ways of raising money. Peltier related that McOmber suggested that Peltier post bond for him, and that if Peltier did so, two of McOmber's friends, Steve Campbell and Doug Johnson, would loan McOmber money to reimburse Peltier for the bail cost. Peltier testified that he then went down to the police station to determine McOmber's bail amount. When McOmber called him back, Peltier informed McOmber that he only had about $400 in his bank account. Peltier stated that McOmber then informed him that he would have the money in Peltier's account by the next morning, as Campbell and Johnson would loan the money.

¶5 Peltier wrote two checks to cover McOmber's bail—one to Powell County Justice of the Peace Terry J. McGillis for $1,390, and the other to Cascade County for approximately $270. McOmber was released from the Powell County jail. Peltier testified that he drove McOmber back to Peltier's house, so that McOmber could attempt to contact Campbell or Johnson. However, McOmber failed to collect the money. Peltier drove him to Missoula that night so McOmber could retrieve his truck. Peltier stated that he asked McOmber for the money several times, but McOmber ultimately never repaid him.

¶6 The $1,390 check Peltier wrote to Justice of the Peace McGillis bounced, the State charged Peltier with one felony count of issuing bad checks on December 2, 2003, and Judge McGillis issued a warrant for Peltier's arrest. Peltier was later arrested in Missoula on unrelated charges, and transported back to Powell County. While incarcerated in Powell County, Peltier provided a written statement on February 18, 2004, describing the events of November 30, 2003. The following day, Captain Patrick W. George with the

3

Powell County Sheriff's Office interviewed Peltier regarding the bad check. The State dropped Peltier's felony charge to a misdemeanor, and he subsequently pleaded guilty to the misdemeanor count.

¶7 The State charged McOmber by information on March 25, 2004, with one count of felony solicitation to commit the offense of issuing a bad check, in violation of §§ 45-4-101 and 45-6-316, MCA. McOmber pleaded not guilty on April 22, 2004. The matter went to trial on December 2, 2004, and the court heard testimony from five witnesses, including Peltier, Campbell, Johnson, and Captain George. The State sought to introduce, as exhibits, both Peltier's February 18, 2004 written statement, as well as a transcript of the February 19, 2004 police interview. Defense counsel objected to the introduction of the exhibits on the ground they violated the "best evidence rule" saying, "Mr. Pelletier [sic] has already testified and that is in fact the best evidence. His written statement from six months before is not the best evidence of what his testimony is on this matter, so we would object to its being offered for the purposes of, purportedly being the truth." Counsel then explained that, "I don't think [the State] get[s] to gild the lily at this point by trying to bolster that, [Peltier's] credibility, by these statements that he gave to law enforcement nearly a year ago . . . as opposed to his testimony yesterday here in open court." After hearing this, the trial judge stated that he assumed the State offered the statements contained in the written statement as prior consistent statements, which the State then confirmed. The Court overruled defense counsel's objection and admitted the written statement as an exhibit under M. R. Evid. 801(d)(1)(B). The same occurred with respect to the transcript.

4

¶8      In his defense, McOmber called one witness, his former cellmate Mike Corrigan, who testified that there was no indication to him that McOmber was talking to Peltier about writing a bad check.  On cross-examination, however, Corrigan conceded that he was unable to hear any of the conversations between McOmber and Peltier regarding McOmber's bail.

¶9      The jury found McOmber guilty of one count of felony solicitation to commit the offense of issuing a bad check on December 3, 2004.  The court entered its judgment on February 10, 2005, sentencing McOmber to seven years at the Department of Corrections with two years suspended.  This appeal followed.

## STANDARD OF REVIEW

¶10     We generally review a district court's evidentiary rulings for an abuse of discretion.  *State v. Gomez*, 2007 MT 111, ¶ 18, 337 Mont. 219, ¶ 18, 158 P.3d 442, ¶ 18. A district court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Matz*, 2006 MT 348, ¶ 34, 335 Mont. 201, ¶ 34, 150 P.3d 367, ¶ 34. "Notwithstanding this deferential standard, however, judicial discretion must be guided by the rules and principles of law; thus, our standard of review is plenary to the extent that a discretionary ruling is based on a conclusion of law.  In such circumstance, we must determine whether the court correctly interpreted the law." *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, ¶ 17, 134 P.3d 45, ¶ 17.

## DISCUSSION

¶11 As a threshold matter, the State, citing *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, ¶ 17, 67 P.3d 207, ¶ 17, contends that this Court should not consider McOmber's claim on appeal because he allegedly changed the legal theory underlying his objection to the introduction of Peltier's written statement and the interview transcript. We reject this contention, as the record shows that, although defense counsel initially asserted the Best Evidence Rule, he then explained that the State was allegedly attempting to bolster its witness's credibility with prior consistent statements. The District Court then inquired whether the State was offering the exhibit as a prior consistent statement, and the State confirmed that it was. The court then overruled McOmber's objection and admitted both exhibits as prior consistent statements. McOmber's appeal is based squarely on that ruling. Accordingly, we will proceed to consider McOmber's claim.

¶12 ***Issue One. Were Peltier's written statement and his statements reflected in the police-interview transcript admissible as prior consistent statements under M. R. Evid. 801(d)(1)(B)?***

¶13 "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). As a general rule, hearsay statements are not admissible. M. R. Evid. 802. However, under M. R. Evid. 801(d)(1)(B):

> A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive . . . . [Paragraph breaks omitted.]

6

Under the rule, there are four requirements that must be met for a statement to be admissible as a prior consistent statement: "(1) the declarant must testify at trial and (2) be subject to cross-examination concerning her statement, and (3) the statements to which the witness testifies must be consistent with the declarant's testimony, and (4) the statement must rebut an express or implied charge of subsequent fabrication, improper influence or motive." *State v. Teters*, 2004 MT 137, ¶ 25, 321 Mont. 379, ¶ 25, 91 P.3d 559, ¶ 25.

¶14   McOmber argues that Peltier's statements to Captain George did not constitute prior consistent statements as defined by M. R. Evid. 801(d)(1)(B). McOmber specifically contends that the State has failed to establish that the statements were made prior to the time the alleged motive to fabricate arose; thus, according to McOmber, the exhibits were inadmissible hearsay and should have been excluded at trial.[1]

¶15   We have previously held that the prior consistent statement rule "only applies when the declarant's in-court testimony has been impeached by another party's allegations of subsequent fabrication, improper influence, or motive." *State v. Lunstad*, 259 Mont. 512, 515, 857 P.2d 723, 725 (1993). In addition, to qualify as a prior consistent statement under M. R. Evid. 801(d)(1)(B), the statement must have been made *before* the alleged motive to fabricate arose. *Teters*, ¶ 27; *State v. Veis*, 1998 MT 162,

---

[1] We note here that the State has failed to address whether or not the statements were properly admitted as prior consistent statements, choosing instead to assume "arguendo" that the statements were inadmissible, and focus on whether their admission was harmless error. This is an improper approach to harmless error analysis. Before reaching the question of harmless error, it must be determined whether an error occurred. *See State v. Van Kirk*, 2001 MT 184, ¶ 42, 306 Mont. 215, ¶ 42, 32 P.3d 735, ¶ 42.

¶ 24, 289 Mont. 450, ¶ 24, 962 P.2d 1153, ¶ 24 (citing *Tome v. U.S.*, 513 U.S. 150, 167, 115 S. Ct. 696, 705 (1995)).

¶16 Peltier, the declarant, testified at trial and was subject to cross-examination. Both Peltier's written statement and the statements he made in the interview with Captain George were consistent with his trial testimony. In addition, as to the requirement that the statements be offered to rebut an express or implied charge of subsequent fabrication, improper influence or motive, the State introduced the exhibits after McOmber called Peltier's credibility into question. On cross-examination of Peltier, defense counsel challenged Peltier's testimony by questioning his motives in making the statements to Captain George. Defense counsel repeatedly questioned whether Peltier's motive in making the statements to Captain George was in order to "pin" the charge on McOmber so that Peltier could get his felony issuing a bad check charge reduced to a misdemeanor. The exhibits were later introduced by the State, as part of its case-in-chief, through the testimony of Captain George, who testified after Peltier.

¶17 Crucially, as to the requirement that the statements were made prior to the time the alleged motive to fabricate arose, McOmber claims this requirement was not met and, therefore, the exhibits' admission was in error. The State charged Peltier with the felony count of issuing a bad check on December 2, 2003, and he was arrested in February 2004 on that charge. While incarcerated in the Powell County jail, Peltier made his written statement on February 18, 2004, and the interview with Captain George took place the following day. McOmber maintains that Peltier's motive to fabricate existed prior to the time he made his statements to Captain George—i.e., the motive arose when Peltier was

8

arrested. We agree with McOmber's assertion. Given that Peltier's prior consistent statements were made after he had been charged and jailed on the felony charge, it is clear that the alleged motive to fabricate arose *before* he made those statements.

¶18 We hold that the District Court erred in admitting the exhibits as prior consistent statements under M. R. Evid. 801(d)(1)(B), given that the State failed to show that the statements were made *before* the alleged motive to fabricate arose.

¶19 ***Issue Two. If the statements were inadmissible, was their admission by the District Court harmless error?***

¶20 McOmber contends that the District Court's erroneous admission of Peltier's statements under M. R. Evid. 801(d)(1)(B) prejudiced McOmber and prevented him from receiving a fair trial. McOmber argues that such error warrants reversal of his conviction. The State counters that the exhibits' admission was harmless error.

¶21 Under § 46-20-701(1), MCA, "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." In *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, we articulated our analytical framework for determining whether an "alleged error prejudiced the criminal defendant's right to a fair trial and is therefore reversible." *Van Kirk*, ¶ 37. The first step in the *Van Kirk* analysis is determining whether the claimed error is categorized as structural error or trial error. *Van Kirk*, ¶ 37.

¶22 Structural error is that type of error which affects the framework within which the trial proceeds, rather than simply an error in the trial process itself. *Van Kirk*, ¶ 38 (citing *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991)). Structural

9

error is "typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding." *Van Kirk*, ¶ 38. Examples of structural error "include errors in the jury selection process, total deprivation of the right to counsel, and lack of an impartial trial judge." *State v. Francis*, 2001 MT 233, ¶ 23, 307 Mont. 12, ¶ 23, 36 P.3d 390, ¶ 23. Furthermore, structural error is presumptively prejudicial, is not subject to harmless error review, and is automatically reversible. *Van Kirk*, ¶¶ 38-39.

¶23 Trial error, by contrast, is that type of error that typically occurs during the presentation of a case to the jury. *Van Kirk*, ¶ 40. Trial error can be reviewed qualitatively for prejudice relative to other evidence introduced at trial. *Van Kirk*, ¶ 40. Trial error is not presumptively prejudicial, is not automatically reversible, and is subject to harmless error review. *Van Kirk*, ¶ 40.

¶24 Here, we are dealing with what is clearly trial error. The error—admitting Peltier's prior consistent statements—arose during the presentation of the case to the jury and is not the type of error that undermines the fairness of the entire trial proceeding. As the admission of Peltier's statements was trial error, we advance to the second step of the *Van Kirk* analysis, which involves determining whether the error was harmless under the circumstances. *Van Kirk*, ¶ 41. We note that once the defendant has established that a trial error occurred and has alleged prejudice resulting from the error, the burden then shifts to the State to demonstrate that the error was harmless. *State v. Peplow*, 2001 MT 253, ¶ 47, 307 Mont. 172, ¶ 47, 36 P.3d 922, ¶ 47; *Van Kirk*, ¶ 42.

¶25 For the reasons discussed in Issue One, McOmber has established that Peltier's prior consistent statements were erroneously admitted. McOmber has also alleged that

the admission of the statements prejudiced him, arguing that "[t]he jury's ability to review [Peltier's] written and taped statements as exhibits, as compared to relying on their memory as to his sketchy and inconsistent trial testimony, prejudiced [McOmber] and denied him the right to a fair trial." McOmber's contentions of prejudice have "arguable merit." *See Peplow,* ¶ 48. Accordingly, the burden is on the State to demonstrate that no reasonable possibility exists that the erroneously admitted evidence might have contributed to McOmber's conviction. *See Van Kirk*, ¶ 42.

¶26 We utilize the cumulative evidence test in determining whether trial error was harmless. *Peplow*, ¶ 47; *Van Kirk*, ¶ 43. The first question under this test is whether the tainted evidence was admitted to prove an element of the offense. *Peplow*, ¶ 49. Next, if the tainted evidence was admitted to prove an element of the offense, the State must (1) direct us to admissible evidence that proves the same facts as the tainted evidence, and (2) also demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction. *Peplow*, ¶ 49; *see also Van Kirk*, ¶¶ 44-45. But if the tainted evidence was not admitted to prove an element of the crime, then the admission of the evidence will be deemed harmless only if the State demonstrates that the quality of the tainted evidence was such that there was no reasonable possibility that its admission might have contributed to the defendant's conviction. *Peplow*, ¶¶ 49, 51; *Van Kirk*, ¶¶ 46, 47.[2]

---

[2] Although the State asserts that the admission of Peltier's statements was harmless error, the State's corresponding analysis fails to track the analytical framework set out in *Van Kirk* and described above. Rather, the State presents a haphazard collection of arguments which, although they do bear on the harmless-error question, are entirely disconnected from the structured

¶27 Accordingly, we must first determine whether Peltier's prior consistent statements were admitted to prove an element of the crime of solicitation to commit the offense of issuing a bad check. To convict McOmber of this offense, the jury needed to be presented with evidence to prove beyond a reasonable doubt that, with the purpose that the offense of issuing a bad check be committed, McOmber commanded, encouraged, or facilitated Peltier in issuing or delivering a check or other order upon a real or fictitious depository for the payment of money knowing that it would not be paid by the depository. *See* §§ 45-4-101 and 45-6-316, MCA. Of particular relevance here, McOmber argues that the State had to prove both that he talked Peltier into writing the bad check and that he knew there were not sufficient funds in Peltier's checking account.

¶28 A review of Peltier's February statements is necessary at this point. In the February 18, 2004 written statement, Peltier wrote that McOmber called him and "told me his situation and asked me to call some bondsman [sic]." After all the bondsmen refused, Peltier wrote that McOmber "said he talked [to] Steve Cambell [sic] and Doug Johnson ["DJ"] and they were loaning him some cash. He told me on the phone I could write him a check and we would go get the cash from DJ, and Steve."

¶29 The February 19, 2004 interview between Captain George ("PG") and Peltier ("WP") included the following discussion:

> PG: Um, in your own words would you go ahead and tell me how this situation played out.
> WP: Um, Sunday, I believe the first call was around 11:30 in the morning. He called me up and let me know he was in jail here. So,

inquiries mandated by *Van Kirk*. To facilitate proper analysis in future cases, we admonish all parties to comply with the foregoing step-by-step approach.

we talked for a few minutes and he said he was going to call some people and see if he could get out. About twenty minutes later he called me back and ask me to do him a favor, call some bondsman. So I told him that I would. He told me he'd call me back in an hour. I called every bondsman that I could, that was listed er and every one of them said no. That his charges were too much or that he'd lied to them before and never or failed to appear a couple of different times. So he called me back and I told him the news and he said he was trying to call his mom and various other people. And he ask me if there was anything I could do about it and I told him no. And several calls later he ask me if I could bail him out. The conversation went that his, if a bondsman were to bail him out it was a certain amount, but if I were to bail him out it would be a certain amount. And I told him that I didn't have the means or the money to do it. So he called Ski [sic] Campbell and Doug Johnson to borrow some money for [sic] them.

PG: This is what he told you?

WP: This is what he said, this is what he said and he called me back and he told me that he had some cash and if I bailed him out. If I wrote a check for him, he would cover the checks. Twenty. He said twenty minutes after I bailed him out I'd have the cash. And so I came down. I told him several times that you know its [sic] Christmas. I don't have the money to write that much of, that much. I think maybe I only had, if I remember right a little over $800.00. And I'd already went Christmas shopping and spent almost half of that. So, I told him it was very important that I have that money. I just opened that account with First Security. I don't think I had bounced any checks. Maybe I had went over my account just once but it was no big deal and I emphasized that several times on the phone. I mean he called me maybe three or four times. I kind-a finally kind-a gave in and told him I'd do it. As long as he was positive he had the cash. And he told me every time that he was positive, that he had the cash to give it to me. So I came down wrote the check and, two checks, one for $1390.00 and the other one was for almost $400.00, $300.00 and something. I believe that one cleared and the other one, the one I'm getting charged for is the $1390.00. And so after I bailed him out he wanted to go somewhere and I was like no we can go right to my house and use the phone. We went to my house he called Steve's house supposable [sic]. I mean I didn't stand over him and make sure he dialed the number or anything. But he wasn't home and then he called DJ and I suppose he wasn't home either. So we were going to get the money in the morning. I believe it was like 7:30 or 8:00 about that time. And he, then I could let him borrow

13

my truck and I gave him a ride to Missoula and that was the last time
I seen him.

¶30    Peltier's written statement and the interview transcript demonstrate that the inadmissible evidence did go to prove an element of the crime. Peltier's statements tend to prove that McOmber was aware that Peltier had insufficient funds in his checking account to cover McOmber's bail and that McOmber nonetheless encouraged Peltier to write the check, knowing that it would not be paid by Peltier's bank. Therefore, the State must (1) direct us to admissible evidence that proves the same facts as Peltier's inadmissible prior consistent statements, and (2) also demonstrate that the quality of Peltier's statements was such that there was no reasonable possibility that they might have contributed to McOmber's conviction.

¶31    With respect to the first requirement, the State directs us to the trial testimony of Peltier, Campbell, and Johnson. Peltier testified that McOmber asked him to call bondsmen on McOmber's behalf. None were willing to post bond for McOmber. Peltier then stated that McOmber called him back to discuss other means of obtaining bail money, including Peltier's writing a check for McOmber's bail. Peltier testified that McOmber "told me that he had talked to Steve Campbell and Doug Johnson, and they were going to lend him some money, that if I wrote the check, and he got out, that he could give me the cash and I could deposit it in my account."

¶32    Peltier then related that he went to the police station to determine McOmber's bail amount. Peltier said he then got in touch with McOmber and informed him that he did not think he had enough in his bank account. Peltier testified that bail was set at about

$1,600 and that he had just a little over $400 in his account.  Peltier testified that he informed McOmber that he only had about $400 in the account and stated that McOmber again told him that Campbell or Johnson would lend McOmber the money and Peltier would have it in his account before the next morning.  Peltier then testified that he picked McOmber up from jail, but McOmber never reimbursed him.  Peltier reiterated that McOmber knew Peltier did not have enough in his account to cover the check.

¶33    Campbell testified that McOmber called and asked Campbell to help bail him out of jail, but Campbell told him that he did not have the money.  Campbell stated that McOmber never talked to him about Peltier's putting up the bail money, and that he never agreed he would give money to Peltier.  On cross-examination, Campbell stated McOmber never called to ask for money to give to Peltier.  Johnson likewise testified that McOmber called him to enquire about bail money, but Johnson told McOmber he would not be able to help.  Johnson also stated that McOmber never talked with him about giving money to Peltier and never agreed to give Peltier money to bail McOmber out.

¶34    The State asserts that Peltier's, Campbell's, and Johnson's testimony "established that McOmber encouraged Peltier to write the check for his bail even though McOmber knew that the check was bad and that it would not be made good before it cleared the bank."  We agree that Peltier's trial testimony, augmented by that of Johnson and Campbell, largely comports with and mirrors the statements Peltier made on February 18 and 19, 2004.  Crucially, Peltier testified that he informed McOmber that he did not have sufficient funds in his bank account to cover the amount of bail.  Peltier also testified that McOmber informed him that Campbell and Johnson would lend McOmber the money

15

and Peltier would have it in his bank account by morning.  This testimony serves to prove the same facts as the tainted evidence proved—that McOmber knew Peltier did not have sufficient funds in his checking account but nonetheless encouraged him to write the check.  For these reasons, we conclude that admissible evidence proved the same facts as Peltier's inadmissible prior consistent statements.

¶35   Lastly, the State is also required to show that, qualitatively, by comparison, Peltier's inadmissible prior consistent statements were such that there was no reasonable possibility they might have contributed to McOmber's conviction.  *Van Kirk*, ¶¶ 44, 47; *Peplow*, ¶ 49.  The State argues that the admission of the prior consistent statements had a minimal effect on the trial because the statements did no more than repeat admissible in-court testimony.  We agree.  Peltier's testimony and his earlier statements were consistent and tended to prove the same facts.  Furthermore, as compared to Peltier's trial testimony, there is nothing about the content of his inadmissible prior consistent statements that was more compelling or deserving of greater evidentiary weight.  His earlier statements also were not inflammatory in any way that would improperly prejudice McOmber in the eyes of the jury.

¶36   However, McOmber claims that "[t]he jury's ability to review [Peltier's] written and taped statements as exhibits, as compared to relying on their memory as to his sketchy and inconsistent trial testimony, prejudiced [McOmber] and denied him the right to a fair trial."  There are two problems with McOmber's assertion.  First, the "sketchy and inconsistent" trial testimony McOmber complains about related not to whether McOmber knew that there were insufficient funds in Peltier's bank account but, rather, to

16

whether Peltier, at the time he made the prior consistent statements to Captain George, had a motive to fabricate so as to "pin" the crime on McOmber. In other words, Peltier's "sketchy and inconsistent" trial testimony and his written and taped statements which went to the jury as exhibits did not bear on the same factual point. As for the former, Peltier indicated on cross-examination that he had a motive to fabricate at the time he made the statements, but on redirect examination he stated that he did not have such a motive. As for the latter, as already explained, the prior consistent statements were offered to prove that McOmber knew there were insufficient funds in Peltier's bank account but nonetheless encouraged Peltier to write the check. Thus, contrary to McOmber's assertion, the jurors in fact did have to rely on their memories of Peltier's "sketchy and inconsistent" trial testimony about his motives; the exhibits concerned an entirely different matter.

¶37 Second, notwithstanding that Peltier's trial testimony was consistent with his prior consistent statements admitted as exhibits, McOmber has failed to explain how the jury's having what amounts to written copies of Peltier's trial testimony prejudiced him. McOmber presented no evidence at trial contradicting Peltier's testimony. Witness Corrigan, who testified that there was no indication to him that McOmber was encouraging Peltier to write a bad check, admitted on cross-examination that he had no direct knowledge of McOmber's conversations with Peltier. Moreover, to the extent McOmber is suggesting that the jurors would have remembered Peltier's testimony incorrectly but for the exhibits containing Peltier's prior consistent statements, there is no evidence in the record supporting this contention.

¶38   We conclude the State has demonstrated that, qualitatively, and in comparison with Peltier's trial testimony, there is no reasonable possibility that Peltier's erroneously admitted prior consistent statements contributed to McOmber's conviction. Accordingly, we hold that the admission of Peltier's prior consistent statements was harmless error.

**CONCLUSION**

¶39   The District Court erred in admitting, as prior consistent statements under M. R. Evid. 801(d)(1)(B), Peltier's February 18, 2004 written statement and the transcript of his February 19, 2004 interview with Captain George. However, the District Court's admission of Peltier's statements was harmless, as the State presented admissible evidence proving the same facts as did Peltier's statements, and qualitatively, there is no reasonable possibility Peltier's statements might have contributed to McOmber's conviction.

¶40   Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

18