JUSTICE McKINNON,
dissenting.
¶39 I respectfully dissent from the Court’s decision on both issues.
¶40 As to Issue 1, I believe prosecutor Thompson’s remarks about three of the defense witnesses (Amie Manahan, Angela Zinke, and Donald Zinke Jr.), and his assertions about the truthfulness of these witnesses’ testimony, constitute plain error requiring a new trial.
¶41 In his rebuttal closing argument, prosecutor Thompson chose not only to “disparage”(Thompson’s own word) Amie, Angela, and Donald, but also to tell the jury that he had personally determined that these witnesses were liars. Thompson asserted (more than once) that Amie, Angela, and Donald were from a “different social stratufm].”[1] He told the jury that these individuals belong to ‘that group of people where you’re unemployed and collecting unemployment or workers’ comp, and you play video games all day.”He criticized Amie’s, Angela’s, and Donald’s attire in court and the fact that one or more of them had been chewing gum while on the witness stand. He posited that these witnesses had “rall[ied]” around Aker because there is recognized “nobility” among these sorts of people to protect their friends, even if doing so “rob[s]” a crime victim of justice. Thompson concluded his remarks by telling the jurors: “And that’s why we [referring to the prosecution] can’t let it go, and that’s why we have to tell you that they [referring to Amie, Angela, and Donald] are not being truthful.”
¶42 Thompson’s disparagements of the defense witnesses and his *504 assertions of personal knowledge about the truthfulness of their testimony were highly improper and unacceptable. Determinations of the credibility and weight of testimony are exclusively within the province of the jury, not the prosecutor. State v. Hayden, 2008 MT 274, ¶ 26, 345 Mont. 252, 190 P.3d 1091. A prosecutor “should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence.” ABA Stands. for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8(b), 106 (3d ed., Am. B. Assn. 1993); accord Hayden, ¶ 28. Thompson’s remarks violated this professional standard, intruded on the jury s function, and prejudiced the constitutional right of the defendant to receive a fair and impartial trial.
¶43 Characterizing Amie, Angela, and Donald as lazy, ill-bred, and poorly clothed, telling jurors that these three individuals come from a “different social stratu[m],” and implying personal knowledge that these witnesses “are not being truthful” clearly exceeded the bounds of proper argument. This is precisely the sort of prosecutorial misconduct that we recently condemned in State v. Criswell, 2013 MT 177, ¶ 49, 370 Mont. 511, 305 P.3d 760. As Chief Justice McGrath observed in his concurring opinion, “[a] prosecutor is an officer of the court” who “must strive to promote justice and the rule of law.” Criswell, ¶ 57 (McGrath, C.J., concurring). “ ‘Unfortunately, some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to carry them beyond the permissible limits of argument.’ ” Criswell, ¶ 55 (McGrath, C.J., concurring) (quoting ABA Stands, for Crim. Just: Prosecution Function and Def. Function, Stand. 3-5.8, Commentary, 107). In this regard, Tpjrosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor’s arguments, not only because of the prestige associated with the prosecutor’s office, but also because of the fact-finding facilities presumably available to the office.” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8, Commentary, 107. ‘Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor’s office and undermine the objective detachment that should separate a lawyer from the cause being argued.” ABA Stands, for Crim. Just.: Prosecution Function and Def. Function, Stand. 3-5.8, Commentary, 108. Such personal opinions have no place in a prosecutor’s closing argument.
¶44 We have explained that the applicability of plain error review must be decided on a “case-by-case” basis. State v. Sullivant, 2013 MT *505 200, ¶ 17, 371 Mont. 91, 305 P.3d 838; State v. Daniels, 2003 MT 247, ¶ 20, 317 Mont. 331, 77 P.3d 224; State v. Finley, 276 Mont. 126, 138, 915 P.2d 208, 215 (1996), overruled on other grounds, State v. Gallagher, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. Here, however, the Court presents a string-cite of cases in which we have not exercised plain error review of a prosecutor’s comments. Opinion, ¶¶ 29-30. Far from a “case-by-case” approach, the Court asserts as a “general” rule that we do not review improper remarks by a prosecutor under the plain error doctrine-even going so far as to fault Aker for not pointing to any case other than Hayden. Opinion, ¶ 30. In my view, however, the Court’s precedent shows something else: that nine times out ten, this Court is willing to overlook improper remarks by prosecutors. The message that this increasingly prevalent practice is sending, unfortunately, is that prosecutors in this State can be assured of having their convictions upheld despite comments made during trial which violate ethical rules and “run the risk of undermining the fundamental fairness of the judicial process.” State v. Lindberg, 2008 MT 389, ¶ 34, 347 Mont. 76, 196 P.3d 1252. Until there are actual consequences, such as reversal of the conviction, the problem is going to persist.
¶45 We must evaluate whether plain error is appropriate in light of the facts of the case before us. Thompson’s remarks during closing argument plainly exceeded the bounds of proper argument. In so doing, his conduct compromised the integrity of the judicial process and calls into question the fundamental fairness of Aker’s trial. Under such circumstances, it is this Court’s “paramount obligation”to review Aker’s prosecutorial misconduct claim and grant appropriate relief. Finley, 276 Mont. at 137, 915 P.2d at 215. In my view, the Court misapplies our plain error doctrine in reaching a contrary result.
¶46 Turning now to Issue 2,1 conclude that defense counsel rendered constitutionally deficient representation by failing to object to the prosecution’s presentation (through multiple witnesses) of C.Y.’s hearsay statements about the offense. Given that the State’s case against Aker depended entirely on C.Y.’s credibility, I would hold that counsel’s deficient performance prejudiced the defense, thus requiring that Aker be granted a new trial. While the Court theorizes that defense counsel made a “tactical, strategic decision” not to object to C.Y.’s hearsay statements, and then speculates further about what defense counsel’s supposed reasons might have been, Opinion, ¶¶ 36-37, it is my view that, regardless of why defense counsel remained silent, his doing so was objectively unreasonable, Whitlow v. State, 2008 MT 140, ¶¶ 18, 20, 343 Mont. 90, 183 P.3d 861.
*506 ¶47 “When claims of ineffective assistance are capable of resolution by examining the record alone, they are appropriate for consideration on direct appeal.” State v. Howard, 2011 MT 246, ¶ 21, 362 Mont. 196, 265 P.3d 606. Generally, we ask “why” counsel did or did not perform as alleged, and then seek to answer the question by reference to the record. State v. Kougl, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095.
If the record on appeal explains “why,” we will then address the issue on appeal. If, as is usually the case, the claim is based on matters outside the record on appeal, we will refuse to address the issue on appeal and allow the defendant to file a postconviction proceeding where he/she can develop a record as to “why” counsel acted as alleged, thus allowing the court to determine whether counsel’s performance was ineffective or merely a tactical decision.
Kougl, ¶ 14.
¶48 We have observed that it may not be necessary to ask “why” in the first instance, however. Kougl, ¶ 15. One such exception, although infrequently applied, is where there is ‘ho plausible justification” for what defense counsel did. If it is apparent that there is no plausible justification for defense counsel’s conduct, then ‘[w]hether the reasons for defense counsel’s actions are found in the record or not is irrelevant. What matters is that there could not be any legitimate reason for what counsel did.” Kougl, ¶ 15 (emphasis added). We applied this exception in Kougl and determined that there was no reason for trial counsel not to ask for a jury instruction to view the testimony of the defendant’s accomplices with suspicion. Kougl, ¶ 20. We noted that trial counsel had nothing to lose in asking for the instruction. Kougl, ¶ 21.
¶49 We also applied the exception in State v. Jefferson, 2003 MT 90, 315 Mont. 146, 69 P.3d 641, and found that there was ‘ho plausible justification” for defense counsel’s remarks in opening and closing statements which undermined the ability of his client to obtain an acquittal. Jefferson, ¶ 50. Similarly, in State v. Rose, 1998 MT 342, 292 Mont. 350, 972 P.2d 321, we found that there was no plausible justification for defense counsel’s failure to ask that the jury be instructed to view an accomplice’s testimony with suspicion. Counsel had nothing to lose in asking for the instruction, and if counsel had asked for the instruction the trial court would have been obligated to grant the request. Rose, ¶ 18.
¶50 Allegations of child sexual abuse are very difficult cases to prosecute. Where the victim is young and unable to testify about a secretive encounter, there often is no other evidence for a prosecutor *507 to rely on in proving the State’s case. Following many child sexual abuse investigations, a prosecutor unfortunately may be forced not to proceed because he is ethically bound to pursue only those prosecutions which he can, by applicable law and rules of evidence, prove. Many states, Montana included, have addressed these difficulties by allowing expert witnesses to testify directly about the credibility of a victim who testifies in a child sexual abuse trial, see State v. Scheffelman, 250 Mont. 334, 342, 820 P.2d 1293, 1298 (1991), and have enacted statutes to assist in the prosecution of child sexual abuse, see § 46-16-220, MCA (child hearsay exception in criminal proceedings).
¶51 The instant proceedings involved an allegation of sexual intercourse without consent perpetrated upon a 12-year-old victim. There were no eyewitnesses to the offense, and while she clearly was competent to testify, C.Y.’s credibility-like that of any child witness-was subject to attack. This was apparent from the beginning of trial: in voir dire, the prosecution suggested that “what the girl has to say when she comes into court and testifies is the most important piece of evidence in these types of cases,’’and in his opening statement, defense counsel told the jury that, ‘Tf]or whatever reason, [C.Y.] was mistaken.”
¶52 C.Y testified first and provided sufficient details to satisfy the elements of the offense. Aside from circumstantial evidence regarding C.Y.’s demeanor following the offense, described by persons who were not witnesses to the crime, the prosecution had very little more that it could present. The State offered no expert witnesses pursuant to the requirements of Scheffelman, 250 Mont. at 342, 820 P.2d at 1298, and the State’s case, therefore, necessarily would rise or fall on the credibility of C.Y.
¶53 In the context of a child sexual abuse prosecution, there can be ‘ho plausible justification” for the admission of hearsay, without objection, that corroborates the child victim’s story. Nevertheless, defense counsel did not object to the admission of C.Y.’s hearsay statements through five different witnessesAwo laypersons, a physician, a counselor, and a law enforcement officer-which bolstered C.Y.’s testimony and corroborated the details of the assault.
¶54 Cari, a “second mom”to C.Y., was asked by the prosecution to give “a full account” of what C.Y. had told her. Cari testified:
Q. What did she tell you?
A. She was telling me that she was sitting on the couch watching t.v., and the kids were upstairs sleeping, and Jim walked in the house and he asked where everybody was at. And *508 she said “well, the kids are upstairs sleeping” and Amie and Don were gone, she was babysitting. And so he didn’t say anything but he walked over and he kind of grabbed her by the shoulders, just, not forcefully but just kind of gently and laid her down on the couch. And when she I guess tried to struggle up once, he just said Tt’s okay. This is normal.” And so she just laid there and he started unbuttoning her pants and pulling her down.
Q. What is her demeanor when she is telling you about this?
A. She’s crying. Her whole body is still shaking. Almost like she’s just cold, she just, her whole body is just absolutely shaking. But I gave her her time, you know, I didn’t rush her. I told her, I said ‘you know, you just need to tell me what happened and make sure that you’re telling me the truth.” And so she started proceeding to tell me about how he took his hand and separated her legs and he was kind of holding her down with one hand and pulling her legs apart with the other. And he took his fingers, and I stopped her there and I asked her; T know this sounds funny, but how many fingers”, and she said “two” that she could think of. She said he had very big hands. And he proceeded to rub her vagina and started going up inside of her and was, she was; he was going in and out of her with his fingers.
¶55 Cari provided significantly more detail of the incident than C.Y. had given during her testimony. The evidence was clearly hearsay. Yet, Aker’s attorney did not object to these statements corroborating and supplementing C.Y.’s own testimony.
¶56 The prosecution next called Jennifer, C.Y.’s mother. Jennifer stated that Cari had told her C.Y. was sexually molested by Jim Aker. Specifically, Jennifer testified: ‘She told (inaudible-crying) Cari told me that my daughter had confided in her that she had been sexually molested.” When Jennifer asked who had molested C.Y., ‘[Cari] said that it was Jim Aker.” This evidence was clearly hearsay. Aker’s attorney did not object to these statements which corroborated and verified the occurrence of the assault and identified Jim Aker as the assailant.
¶57 The State called Dr. Michelle Corbin, who testified that she had conducted a sexual abuse examination of C.Y. Dr. Corbin stated that C.Y. “told me there was digital penetration,” “told me it lasted approximately 20 minutes,” “told me that she thought it happened at the end of November,” and “reported that there was some bleeding afterwards.” Dr. Corbin opined that the lack of physical findings, as in C.Y.’s case, did not reflect on the veracity or truth of C.Y.’s report. No *509 objection was made to any of this testimony.
¶58 The State called Kristi Rydeen, a licensed clinical professional counselor, who testified that C.Y. had told her about “the incident of abuse perpetrated by Jimmie Aker.” The prosecution asked Rydeen, “In your discussions with [C.Y.] did she reference or did you find any other trauma that would explain the symptoms you were observing and having been reported, other than the sexual abuse by [Aker]?” Rydeen replied, “No.” Defense counsel did not object to these statements identifying Aker as the assailant.
¶59 The defense called Sheriff Scott Howard, who had been the lead investigator in the case. Defense counsel covered four areas of examination: C.Y.’s statements as to the date of the offense; C.Y.’s statements as to how she was initially accosted; the Territorial Days Celebration, held seven months after the offense, where C.Y. mistakenly thought she saw Aker; and Aker’s Miranda rights. In cross-examination, however, the prosecutor was allowed to describe C.Y.’s hearsay statements that Aker had put his fingers inside her, that it lasted 20 minutes, that Aker used his hand to hold her down, and that C.Y. bled as a result. Sheriff Howard confirmed the following details of the incident on which C.Y. had been consistent:
Q. But [C.Y.] told you some other things during that [interview] as well, didn’t she?
A. She did.
Q. She told you she was watching a show, right?
A. She did.
Q. And she told you she was sitting on a couch when she was watching her show, right?
A. She did.
Q. And you indicated to Mr. Hooks that she also said ‘he told me to lay down,” right?
A. That’s correct.
Q. And that “everything was going to be okay’?
A. That’s correct.
Q. And that he put his hand on her chest, correct?
A. Correct.
Q. And he stuck his fingers inside of her?
A. He did.
Q. And pulled her pants down, right?
A. That’s what she said, yes.
Q. This is what [C.Y.] is telling you on January 14th, right?
A. That’s correct.
Q. Approximately 5-6 weeks after the alleged incident, right?
*510 A. That’d be fair, yes.
Q. She said it lasted about 20 minutes?
A. She did.
Q. And even at that time she said she had her eyes closed, right?
A. Yes.
Q. And then she told you afterwards she was bleeding?
A. She did.
Q. And she also said at that time that Mr. Aker told her that [she] and he would be in trouble if she told anybody?
A. She did.
Consequently, in addition to C.Y.’s testimony, the jury heard the core details of the incident on five more occasions through five different witnesses. All of these witnesses’ testimony about the incident came from C.Y.’s hearsay statements. None of the witnesses had personal knowledge of the facts of the incident. All of this testimony was admitted without objection from Aker’s counsel.
¶60 The State argues that Aker’s counsel failed to object to C.Y.’s prior consistent statements, presented through five other witnesses, in order to emphasize ‘inconsistent details” in C.Y.’s retelling of the incident. However, the admission of prior inconsistent statements is not contingent upon the admission of prior consistent statements. Prior inconsistent statements are admissible pursuant to M. R. Evid. 801(d)(1)(A). Prior consistent statements, on the other hand, are not admissible unless they are “offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive.”M. R. Evid. 801(d)(1)(B). We have held that the prior consistent statement rule applies only when the declarant’s in-court testimony has been impeached by another party’s allegations of subsequent fabrication, improper influence, or motive. State v. McOmber, 2007 MT 340, ¶ 15, 340 Mont. 262, 173 P.3d 690; see also State v. Champagne, 2013 MT 190, ¶ 39, 371 Mont. 35, 305 P.3d 61. Here, there were no allegations of subsequent fabrication or that C.Y. had been improperly coached or influenced. Thus, it is not plausible to allow the admission of prior consistent statements, which corroborated C.Y.’s testimony, for the purpose of emphasizing prior inconsistent statements. Aker’s counsel could have had the inconsistent statements admitted under M. R. Evid. 801(d)(1)(A) and objected to C.Y.’s prior consistent statements under M. R. Evid. 801(d)(1)(B).
¶61 The Court’s reliance on Riggs v. State, 2011 MT 239, 362 Mont. 140, 264 P.3d 693-see Opinion, ¶ 36 is unpersuasive. There, the *511 district court found in the postconviction proceeding that “the alleged prior consistent statements were not hearsay, were successfully objected to, or were inconsistent with other statements made by the girls.”Riggs, ¶ 52. Here, in contrast, C.Y.’s statements-as repeated at trial by Cari, Jennifer, Dr. Corbin, Rydeen, and Sheriff Howard-were plainly hearsay. They were not objected to at all. And they were not inconsistent with C.Y.’s testimony, but were in fact consistent with C.Y.’s description of the “core details” of the incident-something the prosecution hammered during its closing arguments. Riggs is simply not on point.
¶62 The notion that Aker’s counsel endeavored in his cross-examination of the State’s witnesses to Illuminate inconsistencies” in C.Y.’s statements, Opinion, ¶ 13, is speculation. It also misstates counsel’s argument. For example, regarding the date of the offense, C.Y. originally told Sheriff Howard that the incident occurred in the third or fourth week of November 2009, but further investigation revealed that the actual date was December 4, 2009. Aker’s counsel argued in closing that this was “not an inconsistency. It’s a mistake.” He added: ‘We know that [C.Y.] was wrong, verifiably wrong in other regards.” Counsel later reemphasized that “we know that the child in question, [C.Y.], had made mistakes.”The point of this argument was not that C.Y. gave inconsistent stories to different people; counsel’s argument, more precisely, was that C.Y. was a child who tended to make “mistakes.”He used this term continually throughout his closing. Clearly, however, it was not necessary for counsel to allow repeated recitations of C.Y.’s prior consistent statements in order to show that C.Y. was a child who makes mistakes.
¶63 Based upon the foregoing, I believe it is not necessary to ask “why” counsel failed to object to the admission of C.Y.’s hearsay statements. In my view, there is no plausible justification for failing to object and we thus may rule on the merits of Aker’s ineffective assistance of counsel claim on direct appeal. Further, having determined that Aker’s counsel could have no plausible justification for failing to object, counsel’s performance was deficient and the first prong of the test is satisfied. See Riggs, ¶ 9 (to prevail on an ineffective assistance of counsel claim, the defendant must first demonstrate “that counsel’s performance fell below an objective standard of reasonableness”).
¶64 To establish prejudice under the second prong of the test, Aker must show “that a reasonable probability exists that, but for counsel’s errors, the result of the proceeding would have been different.” Riggs, ¶ 9. “A reasonable probability is a probability sufficient to undermine *512 confidence in the outcome of the proceeding.” Riggs, ¶ 12. Here, the cumulative effect of counsel’s errors prejudiced Aker’s right to a fair trial. State v. Ferguson, 2005 MT 343, ¶ 126, 330 Mont. 103, 126 P.3d 463. It is reasonably probable that the outcome of the proceeding would have been different had counsel objected to the introduction of all of C.Y.’s prior consistent statements. Indeed, this is clear from the prosecution’s heavy emphasis, during closing argument, on the fact that
the core, core details about Mr. Aker coming into that home when the kids were sleeping, walking across that room, coming up to her while Hannah Montana was on, sexually assaulting her, pushing her down, placing his fingers in her. Those core details have never changed. Hannah Montana was always on tv every time she told the story [to the various witnesses who then repeated her statements at trial].
Permitting the jury to hear improper hearsay testimony from five different witnesses which corroborated the victim’s testimony and the specific details of the sexual assault prejudiced Aker’s right to a fair trial.
¶65 For the foregoing reasons, I would reverse Aker’s conviction based upon prosecutorial misconduct and ineffective assistance of counsel. I respectfully dissent from the Court’s contrary decision.
JUSTICE COTTER joins the Dissent of JUSTICE McKINNON.

 Thompson used the word “stratus.” However, I presume he meant “stratum,” given that “stratus”refers to a type of cloud formation. In this context, “stratum” means “a socioeconomic level of society comprising persons of the same or similar status esp. with regard to education or culture.” Merriam-Webster’s Collegiate Dictionary 1162 (10th ed., Merriam-Webster 1997).